**Roderick STUBBS, Petitioner–Appellant,**

v.

**James GOMEZ, Director, Department of Corrections; Theo White, Warden, Respondents–Appellees.**

**No. 98–16333.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted June 14, 1999.

Filed Sept. 1, 1999.

Stephen B. Bedrick, Oakland, California, for the petitioner-appellant.

Donna B. Chew, Deputy Attorney General, San Francisco, California, for the respondents-appellees.

Before: HALL, THOMPSON and FLETCHER, Circuit Judges.

DAVID R. THOMPSON, Circuit Judge:

Roderick Stubbs, an African–American, was convicted of the first-degree murder of another African–American by a state court jury that contained no African–Americans. The district court denied Stubbs's 28 U.S.C. § 2254 habeas petition challenging his conviction on the ground that the state trial prosecutor exercised peremptory challenges to exclude African–Americans from his jury by reason of their race. Applying *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), the district court determined that Stubbs had presented a prima facie case of race discrimination in jury selection. After a hearing in which Stubbs's trial prosecutor testified as to the reasoning behind his peremptory challenges, the district court found that Stubbs had failed to prove that the prosecutor had excluded African–American jurors from the jury on account of their race, and denied the habeas petition. Stubbs appeals. We have jurisdiction pursuant to 28 U.S.C. § 2253, and we affirm.

I

FACTS

A. Voir Dire

In June 1994, Stubbs was tried for first-degree murder in Alameda County Superior Court in Oakland, California. There were forty-six persons in the jury venire, eight of whom were African–American.

The prosecutor excused six potential trial jurors for cause. Of the six excused for cause, five were African–Americans. The prosecutor then used peremptory challenges to strike the remaining three African–Americans. In this appeal, Stubbs challenges the prosecutor's peremptory challenges of two of these three African–Americans, Anita Mitchell and Chaquita Goodloe.

### 1. Anita Mitchell

Anita Mitchell's jury questionnaire revealed that she was 38 years of age and had three years of college education. She was married to a house painter and had one child, a high school senior. Ms. Mitchell was employed as a store manager. She had never served as a juror. She did not know anybody connected with the court system or involved in law enforcement. Neither she nor anyone close to her had ever been accused of, arrested for, charged with, or convicted of a crime. She indicated that neither she nor anyone close to her had ever been a victim of, or a witness to, a crime. Nothing in her questionnaire indicated that she could not be a fair and impartial juror. The trial judge asked no questions of Ms. Mitchell.

The prosecutor asked Ms. Mitchell twenty-six questions. He determined that she had previously worked as a regional manager for eight years for Jack in The Box. He then asked if she had ever witnessed a crime at her workplace. Initially, she said no, but, after a few more questions, she stated she had witnessed one crime where a "guy came in. We [were] opening the store ... and I was upstairs in the safe. He came upstairs, had a gun, locked us in the attic, took all the money out of the safe, and took the phones." She stated that the police were called, but she believed that no one was ever apprehended. She had no feelings-positive or negative-about how the Oakland Police handled the situation. In response to questioning by the defense, she stated that the robber did not point a gun at her, and the experience would not affect her ability to decide the case.

Ms. Mitchell was also questioned about her daughter's upcoming high school graduation, which was scheduled for the next Thursday. She said she did not want to miss the "full-day commitment" for that event, and that the graduation started at 5:00 p.m.

The prosecutor challenged Ms. Mitchell for cause, citing her failure to reveal on her questionnaire that she had been a witness to a crime. The prosecutor also argued that her attention to her duties as a juror would be compromised by her desire to attend her daughter's graduation. The defense opposed the challenge, noting that "Ms. Mitchell was up-front about the robbery in court" and "the court could accommodate" her desire to attend the graduation.

The trial judge asked Ms. Mitchell some follow-up questions about why she failed to disclose the robbery. She said, "I forgot really about the robbery ... I had really forgot about it until the District Attorney had said about the job." She indicated that the robbery occurred in 1979 or 1980, approximately fifteen years earlier. With regard to her daughter's graduation, she stated that, because this was the first high school graduation she had attended for a child, she "really [did not] know" whether it was an "all-day affair," but "we're supposed to be there like at 4:00." After the questioning, the prosecutor pursued his challenge for cause. He said: "I think there's something going on here, as far as willing to come forth with this information. I don't know why. But I'm troubled by it." The judge denied the challenge. The prosecutor later used his first peremptory challenge to strike Ms. Mitchell.

### 2. Chaquita Goodloe

Chaquita Goodloe's jury questionnaire revealed that she was 25 years of age, single, and the mother of five young children, including twins. She had attended one year of junior college. She did not list any occupation or employer. She lived with her brother, who was employed as a

courier driver. Her hobbies were reading, writing, and playing the piano. She was a registered voter. She had never served as a juror. She did not know anybody connected with the court system or involved in law enforcement. Neither she nor anyone close to her had ever been accused of, arrested for, charged with, or convicted of a crime. Neither she nor anyone close to her had ever been a victim of, or a witness to, a crime. Nothing in her questionnaire indicated that she could not be a fair and impartial juror.

The trial judge did not ask any questions of Ms. Goodloe, stating, "Nothing personal. It means you did a good job on your questionnaire." The prosecutor asked Ms. Goodloe three questions, and determined that she lived in East Oakland rather than West Oakland. The defense asked four questions, determining that Ms. Goodloe had strong views in favor of gun control, but she said those views would not make her biased against the defendant.

Neither side challenged Ms. Goodloe for cause. The prosecutor, however, struck her by using a peremptory challenge.

### B. Trial Court *Batson* Motion

After the prosecutor struck Ms. Goodloe, Stubbs made a timely *Batson* motion. Ruling on the motion, the state trial court judge recognized that Stubbs was an African–American and that the prosecutor had used challenges for cause to strike five African–Americans, and had used peremptory challenges to strike the remaining three. The court stated, however, that "a prima facie case [had not] been shown in the exercise by [the prosecutor] of a systematic exclusion or a designed exclusion of African–American males [sic] by the exercise of peremptory challenges." The court added:

> With respect to Ms. Goodloe, I will observe that, yes, her questionnaire was fine. And the answers she gave by the limited number of questions that were asked of her were fine. But I personally observed a demeanor which is hard for me to describe, but of disinterest,

didn't really seem to make eye contact, was slouched in her chair. It didn't seem to me that she was somebody that was particularly interested in being a juror.

Although the trial court determined that Stubbs had not made a prima facie case under *Batson*, the court offered the prosecutor the opportunity to explain the basis for his challenges. The prosecutor declined.

### C. State Conviction and Federal Habeas

Stubbs was found guilty of first-degree murder and of personally using a firearm and inflicting great bodily injury during the commission of the offense. The California Court of Appeal affirmed his conviction, and the California Supreme Court denied review. Stubbs is currently serving a sentence of 29 years to life.

After exhausting state court review, Stubbs filed a petition for habeas corpus in the United States District Court for the Northern District of California. He contended that the State had denied him the equal protection of its laws when it put him on trial before a jury from which members of his race had been purposefully excluded in violation of the Fourteenth Amendment, as articulated by the Supreme Court in *Batson*.

The district court determined that the prosecutor's use of challenges for cause should not be considered in evaluating whether Stubbs had made a prima facie case of racial discrimination, but decided that Stubbs had presented a prima facie case anyway. The court scheduled an evidentiary hearing to examine the prosecutor's motives in exercising the peremptory challenges to strike Anita Mitchell and Chaquita Goodloe.

Before the date set for the evidentiary hearing, Stubbs took the prosecutor's deposition. He then sought a postponement of the hearing to give him time to find and hire a psychologist to testify that the "prosecutor's [explanations for striking

Mitchell and Goodloe], although arguably race-neutral on the surface, [were], in reality, pretextual, based on racial stereotypes, and race-based reasons." He also sought an order from the court to provide him with funds to pay the expert pursuant to 18 U.S.C. § 3006A(e). In ruling on these requests, the district court stated: "I at this point have no reason to believe that I would grant permission or grant funding for you to retain the kind of expert you are going [on] about. The only way I can interpret this is that you want someone to come in and tell me that what the prosecutor did was pretextual, or they were not valid reasons. It seems to me that is what I get paid to do." Concluding that "this type of testimony would not be of any assistance to me," the district court "declin[ed] to grant funds for such an expert or to consider such testimony." The district court did, however, grant a short postponement of the evidentiary hearing.

At the evidentiary hearing, the state trial prosecutor testified and gave his reasons for using peremptory challenges to excuse Anita Mitchell and Chaquita Goodloe. He stated that he believed Anita Mitchell "was not telling the truth about ... a very significant incident in her background ... [a]nd for that reason alone, or primarily, ... [he] decided that she should be excused." He further explained:

> [S]he only informed me of this after I kept pressing her on the issue.... I think finally at the end she finally said, "By the way, this situation happened." And I just didn't find it to be a credible explanation of what I consider a traumatic event. And so I felt she was withholding information for some reason, for whatever reason.

When asked if he had any particular reasons for suspecting Ms. Mitchell was withholding information, he replied:

> Well, as a prosecutor, I had suspicions. I felt that perhaps she was involved in it. Perhaps she was a suspect in it. Perhaps she knew the individual who did it. The questionnaire indicated that she was a resident of East Oakland, had been

raised in East Oakland, and that the robbery had occurred in East Oakland. Perhaps there was an internal investigation at the Taco Bell that left some unresolved issues. So those were my suspicions.... And that's primarily the reason I challenged her.

On cross-examination, the prosecutor admitted that he had conducted voir dire in other cases in which jurors had forgotten they had been a victim of or a witness to a crime, and he had not challenged them. The prosecutor added that he was also concerned about the potential conflict between Ms. Mitchell's duties as a juror and her plans to attend her daughter's graduation. He testified, "she left me with the impression that [the graduation] was a commitment that she was not going to alter, regardless of the trial and the schedule."

As to his strike of Ms. Goodloe, the prosecutor explained:

> The first and foremost reason was the way she presented herself in court. She appeared to me to be lethargic, intellectually and physically. She did not appear to be someone very interested in the proceedings, or at least very attentive.... She also had no working experience at all. She was twenty-I believe twenty-five at the time. She had five children. She had never been married. She wasn't working. And her overall appearance and presentation in court suggested to me that she would not be someone that I would want on my jury because of her background.

On cross-examination, the prosecutor acknowledged that Ms. Goodloe's jury questionnaire did not state that she had no work history, but that he had made that "assumption." He also assumed that because Ms. Goodloe was raising several children she lacked experience "relating to people outside the home."

Following the evidentiary hearing, the district court heard oral argument and ruled from the bench: "I find that the

reasons stated by the prosecutor were valid, they were credible, they were non-discriminatory on their face, and they were supported by the jury questionnaires and other evidence in the record." The district court denied Stubbs's habeas petition and his motion for reconsideration, but granted a certificate of appealability. This appeal followed.

## II

### Standard of Review

■ We review de novo the decision of a district court to grant or deny a petition for a writ of habeas corpus. *Bonin v. Calderon*, 59 F.3d 815, 823 (9th Cir.1995). We review a district court's findings of fact for clear error. *Id.*

## III

### *Batson* Claim

The Supreme Court has outlined a three-step process for evaluating a *Batson* claim: (1) the defendant must make a prima facie case raising an inference that the prosecutor has exercised a peremptory challenge on the basis of race; (2) if the prima facie case is made, the burden shifts to the prosecutor to articulate a race-neutral explanation for striking the juror in question; and (3) if parts one and two are satisfied, the court must determine whether the defendant has carried his ultimate burden of proving purposeful discrimination. *See Hernandez v. New York*, 500 U.S. 352, 358–59, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991) (plurality opinion).

### A. Prima Facie Case

■ For a defendant to establish a prima facie case, the defendant must show that (1) "he is a member of a cognizable racial group"; (2) "the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race"; and (3) "these facts and any

other relevant circumstances raise an inference that the prosecutor used that practice to exclude the veniremen from the petit jury on account of their race." [1] *Batson*, 476 U.S. at 96, 106 S.Ct. 1712.

■ In ruling on Stubbs's *Batson* motion, the state trial court determined that Stubbs had not made a prima facie showing that the prosecutor had exercised peremptory challenges on the basis of race. The district court, however, in considering Stubbs's habeas petition, determined that Stubbs had made a prima facie case. The district court then conducted an evidentiary hearing in which the trial prosecutor testified as to his reasons for using peremptory challenges to excuse Ms. Mitchell and Ms. Goodloe. After that hearing, the district court rejected Stubbs's *Batson* claim.

Both parties have extensively briefed the question whether Stubbs made a prima facie *Batson* showing. That issue, however, has been mooted by the district court's evidentiary hearing. In *Hernandez*, the plurality explained: "Once a prosecutor has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant has made a prima facie showing becomes moot." 500 U.S. at 359, 111 S.Ct. 1859 (citing *United States Postal Service Bd. of Governors v. Aikens*, 460 U.S. 711, 715, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983) ("[W]here the defendant has done everything that would be required of him if the plaintiff had properly made out a prima facie case, whether the plaintiff really did so is no longer relevant.")); *see also United States v. Gillam*, 167 F.3d 1273, 1277 (9th Cir.), *petition for cert. filed*, (U.S. July 19, 1999) (No. 99–5357).

**1.** In *Powers v. Ohio,* 499 U.S. 400, 402, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991), the Supreme Court abolished the requirement that the defendant and the stricken juror share the same race. The Court has also extended *Bat-*son to apply to gender-based discrimination in the use of peremptories. *See J.E.B. v. Alabama ex rel. T.B.,* 511 U.S. 127, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994).

Although the prosecutor did not offer any explanation in the state trial court for his peremptory challenges of Ms. Mitchell and Ms. Goodloe, he did provide explanations for those challenges during the evidentiary hearing in the district court. The district court considered those explanations, found them to be race-neutral, and rejected the *Batson* claim. That mooted the question whether Stubbs had satisfied *Batson*'s first-step requirement of making a prima facie case. The issues we consider, therefore, are whether the prosecutor's explanations were facially race-neutral, and if they were, whether notwithstanding that circumstance the prosecutor engaged in purposeful discrimination in excluding African–Americans from Stubbs's jury.

B. Race-neutral Reasons

■ At the second step in the *Batson* analysis, the burden shifts to the prosecution to articulate a race-neutral explanation for the exercise of the peremptory challenge in question. We review de novo a district court's holding that a prosecutor's proffered reason for a peremptory challenge is race-neutral. *United States v. McCoy*, 23 F.3d 216, 217 (9th Cir.1994).

■ "In evaluating the race-neutrality of an attorney's explanation, a court must determine whether, assuming the proffered reasons for the peremptory challenges are true, the challenges violate the Equal Protection Clause as a matter of law." *Hernandez*, 500 U.S. at 359, 111 S.Ct. 1859. Noting that "official action will not be held unconstitutional solely because it results in a racially disproportionate impact" and that "[p]roof of racially discriminatory intent is required," the Supreme Court has defined a race-neutral reason:

A neutral explanation in the context of our analysis here means an explanation based on something other than the race of the juror. At this step of the inquiry, the issue is the facial validity of the prosecutor's explanation. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race-neutral.

*Id.* at 360, 111 S.Ct. 1859; *see also Purkett v. Elem*, 514 U.S. 765, 769, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995) ("[A] 'legitimate reason' is not a reason that makes sense, but a reason that does not deny equal protection.").

■ Both of the reasons provided by the prosecutor for striking Ms. Mitchell are, or are similar to, reasons that have been recognized as race-neutral. The prosecutor explained that the primary reason he struck Ms. Mitchell was that she did not reveal in her questionnaire that she had been a victim of a violent crime, and he thought she was lying about it. *See McCain v. Gramley*, 96 F.3d 288, 293 (7th Cir.1996) (prosecutor's reason for striking juror-he thought a juror who lived in high-crime neighborhood was lying about never being the victim of a crime-was race-neutral); *Kelly v. Withrow*, 25 F.3d 363, 366–67 (6th Cir.1994) (no racial discrimination in prosecutor's striking of a juror that the prosecutor did not believe answered questions truthfully). The prosecutor's secondary reason was a concern that Ms. Mitchell's desire to attend her daughter's graduation might compromise her duties as a juror. *Cf. United States v. Lorenzo*, 995 F.2d 1448, 1454–55 (9th Cir. 1993) (concern that a juror might hold his loss of pay against the prosecution is race-neutral).

■ The prosecutor also asserted two reasons for striking Chaquita Goodloe that are similar to reasons previously held to be race-neutral. First, he stated that Ms. Goodloe's demeanor and lack of eye contact showed a disinterest in being a juror. *See United States v. Changco*, 1 F.3d 837, 840 (9th Cir.1993) ("[P]assivity, inattentiveness, or inability to relate to other jurors [are] valid, race-neutral explanations for excluding jurors."); *United States v. Power*, 881 F.2d 733, 740 (9th Cir.1989) (deeming race-neutral the government's explanation that a juror's "fidgeting and looking around as he sat in the jury box ... made the prosecutor believe that the individual would not be an attentive ju-

ror."). Second, the prosecutor asserted that he did not want Ms. Goodloe as a juror because she lacked employment experience and experience outside of the home. *See United States v. Hunter*, 86 F.3d 679, 683 (7th Cir.1996) (employment status and personal history are race-neutral reasons for striking a juror).

Although the prosecutor's explanations for striking Ms. Mitchell and Ms. Goodloe appear, on their face, to be race-neutral, Stubbs contends they are not. Citing *United States v. Bishop*, 959 F.2d 820, 822–26 (9th Cir.1992), he argues that the prosecutor's explanations are transparent proxies for racism. He contends that the prosecutor's asserted suspicion that Ms. Mitchell lied, based in part on her working and living in East Oakland (a predominately African–American neighborhood), is racial stereotyping. He also contends that the prosecutor's concerns about Ms. Goodloe are stereotypes about African–American single mothers. Relying on *Bishop*, Stubbs contends the prosecutor's explanations are not race-neutral. We reject this argument.

In *Bishop*, we recognized that under some circumstances a criterion that is "closely tied to race ... cease[s to be] race-neutral and become[s] a surrogate for impermissible racial biases." 959 F.2d at 823. We held that a reason is not race-neutral if there is no "nexus between the jurors' characteristic ... and their possible approach to a specific trial." *Id.* at 825. In other words, a "generic reason[ ][or] group-based presupposition[ ] applicable in all criminal trials" to members of a minority is not race-neutral. *Id.* Such a reason is unacceptable because, if true, it would violate the equal protection clause. *See id.* at 826.

Thus, in *Bishop*, we rejected a prosecutor's explanation that he struck an African–American juror who lived in Compton, a poor and predominately African–American community, because he believed Compton's residents were likely to be anesthetized to violence:

The prosecutor's justification in this case, unlike in *Hernandez*, referred to collective experiences and feelings that he just as easily could have ascribed to vast portions of the African–American community. Implicitly equating low-income, black neighborhoods with violence, and the experience of violence with its acceptance, it referred to assumptions that African–Americans face, and from which they suffer, on a daily basis. Ultimately, the invocation of residence both reflected and conveyed deeply ingrained and pernicious stereotypes. *Id.* at 825. We recognized, however, that residence could be a race-neutral factor when applied to a specific juror's suitability to sit in a particular case. *See id.* at 826.

The prosecutor's reasons in the present case are not corrupted by the defect described in *Bishop*. The prosecutor's reasons for excusing Ms. Mitchell and Ms. Goodloe were not generalized but had particular race-neutral relevance to each of them. The prosecutor's concerns about Ms. Mitchell were prompted by her failure to disclose that she had witnessed a violent crime, and by her concern that the trial might interfere with her attending her daughter's graduation. His concerns about Ms. Goodloe were prompted by her demeanor and her answers on the jury questionnaire. The prosecutor did not strike either juror because of some group-based presumption generally applicable to African–American jurors. We hold, therefore, that the prosecutor's reasons were facially race-neutral. We next consider the third step in the *Batson* analysis.

## C. The Ultimate Question of Purposeful Discrimination

 We review for clear error the district court's ultimate finding that the prosecutor did not purposefully discriminate. *See United States v. De Gross*, 960 F.2d 1433, 1442 (9th Cir.1992) (en banc).

Substantial evidence supports the district court's finding. The record reflects

the prosecutor's legitimate concern over Ms. Mitchell's failure to reveal that she had been a victim of a violent crime. The trial judge's ruling that Ms. Mitchell's omission was honest and did not warrant for-cause removal did not preclude the prosecutor from disagreeing and using a peremptory challenge to remove her. *See J.E.B.*, 511 U.S. at 148, 114 S.Ct. 1419 (O'Connor, J. concurring) ("That a trial lawyer's instinctive assessment of a juror's predisposition cannot meet the high standards of a challenge for cause does not mean that the lawyer's instinct is erroneous.").

With regard to Ms. Goodloe, the state trial judge's comments about her apathy, and the lack of any employment history or occupation on her questionnaire, corroborate the prosecutor's race-neutral explanations given during the evidentiary hearing in the district court.

In sum, the district court did not clearly err in finding that Stubbs's state trial prosecutor did not purposefully discriminate on the basis of race in his use of peremptory challenges.[2]

## IV

### Criminal Justice Act Funds

Stubbs argues that the district court abused its discretion in denying his request for funding to retain an expert to testify about whether the prosecutor's explanations for his peremptories were race-based or pretextual. We disagree.

Pursuant to 18 U.S.C. § 3006A(e), counsel for an indigent habeas petitioner may request the district court to authorize the expenditure of funds for expert services. The decision to grant or deny a request for expert services is committed to the sound discretion of the district court, and will be overturned on appeal only for an abuse of discretion. *Bonin v. Calderon*, 59 F.3d 815, 837 (9th Cir.1995). It is not

an abuse of discretion for a district court to deny funds under section 3006A when the habeas petitioner (1) fails to establish "that reasonably competent retained counsel would have required the requested services for a habeas petitioner who could pay for them," and (2) fails to demonstrate "by clear and convincing evidence that the defense was prejudiced by the lack of [the requested services]." *Id.; see also United States v. Labansat*, 94 F.3d 527 (9th Cir. 1996). Stubbs failed to make this required showing.

AFFIRMED.

---

**2.** We do not address whether the prosecutor's use of challenges for cause to excuse five African–Americans is a relevant factor in assessing either a prima facie case or the ultimate question of purposeful discrimination.

Whether Stubbs presented a prima facie case is not before us, and the prosecutor's challenges for cause would not alter our conclusion that the district court did not clearly err in finding no purposeful discrimination.