**Eppie McCLAIN, Petitioner–Appellant,**

v.

**K.W. PRUNTY, Warden; Attorney General of the State of California, Respondents–Appellees.**

**No. 99–55423.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Feb. 8, 2000.

Filed July 5, 2000.

Sanford Svetcov (Argued) and Juliette Hirt (Brief), Landels Ripley & Diamond, LLP, San Francisco, California, for the petitioner-appellant.

Peggie B. Tarwater, (Argued) and Andrew D. Amerson, (Brief), Deputy Attorney Generals, Los Angeles, California, for the respondents-appellees.

Before: PREGERSON and WARDLAW, Circuit Judges, and SHADUR,[1] District Judge.

PREGERSON, Circuit Judge:

California state prisoner Eppie McClain appeals the district court's denial of his petition for habeas corpus in which he challenged his conviction for second-degree robbery. McClain, who is black, asserts that at his state trial the prosecutor exercised peremptory challenges to exclude all blacks from the jury in violation of the Equal Protection Clause of the Fourteenth Amendment, as articulated in *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). On direct appeal, the California Court of Appeal affirmed his conviction and the California Supreme Court denied review. After exhausting state court remedies, McClain filed a federal habeas petition with the district court. The district court denied the petition because it found that McClain did not establish that the prosecutor engaged in *purposeful discrimination,* as required by *Batson.* McClain challenges this finding. We have jurisdiction pursuant to 28 U.S.C. § 2253, and we reverse.

---

**1.** The Honorable Milton I. Shadur, Senior United States District Judge for the Northern District of Illinois, sitting by designation.

## I

In March 1996, the State of California prosecuted McClain for second degree robbery in Los Angeles County Superior Court. There were thirty-nine people in the jury venire, three of whom were black. Neither the prosecutor nor defense counsel challenged any prospective jurors for cause. The prosecutor, however, excused a total of ten prospective jurors through the exercise of peremptory challenges, including all three prospective black jurors. In this appeal, McClain challenges the removal of two of these three prospective black jurors. We will refer to the two jurors as "SR" and "JH."

### 1. *Prospective Juror SR*

During voir dire, the court asked the prospective jurors to introduce themselves. SR, a black woman, stated, "My name is [SR]. I'm a resident of Westchester, California. My occupation, I'm with U.S.A. Airlines in maintenance. I'm single. I have no spouse, and I have four children. I haven't had any prior jury experience in either civil or criminal." Later, the court instructed prospective jurors who had been victims of crime to identify themselves. SR responded, "My daughter was attending U.S.C. in 1980, I think, and she was robbed at a Bank of America." The court asked SR if her daughter ever went to court and she replied, "No, No." The court then asked SR if she felt that she could be fair. SR replied, "Yes."

After a few more minutes of voir dire, the court asked prospective jurors to identify themselves if they had any background working in the law. In response SR stated, "My oldest daughter, she is working for a law firm downtown. She is a supervisor of where they serve the papers . . . [she is a] process server." The court then asked jurors to disclose additional information of interest about themselves. SR stated, "My daughter is sixteen. She goes to Santa Monica, and she is active in track there. And I'm active as well [as a volunteer for] [ ] various programs." The court then inquired, "So you're involved in com-munity organizations?" SR answered "yes" and the court replied, "good."

Additionally, the court asked prospective jurors to identify themselves if they had "never participated in any kind of a decision-making exercise with other adults, [such] as in a committee." The court and SR then engaged in the following colloquy:

Court: Is there anyone here who just has not had the experience of sitting around a table and making a decision with other adults? (The court recognized SR).

SR: No. Except in my job we have to vote for shop stewards and things like that.

Court: Now, does that involve group decision making, or is that more of a secret ballot type of thing?

SR: Group decision making.

Court: And when you vote for shop steward, do you basically gather together in a room or around the table and—

SR: No. We just pick who we think we want, and we put it in a box.

Court: Okay. Other than voting, do you have the opportunity to express an opinion on this?

SR: Well, lately the shop has the program where they—program on concept that everybody comes and we listen, and then we all work together for the company like that. Yes, I've been involved in that as a group.

Court: Okay. And when the group meets, you have the opportunity to have input and make a statement?

SR: Right.

Court: And then you make a decision as a result of your meeting, your deliberations?

SR: We can express our opinions but then we don't make the final decision.

Court: So you never really have an opportunity to just make a group decision?

SR: No.

Court: How do you feel about serving on a jury?

SR: I've always wanted to.

Court: You don't think you will be too intimidated to get in there and state what you feel and cast a vote in accordance with your own?

SR: No. I've been living for years and this is my first opportunity.

Court: Good.

Later, a private meeting was held for those jurors who wanted to disclose further information about themselves outside the presence of the other prospective jurors. At this meeting, the following conversation took place:

Court: Okay. [SR], sorry to say this is as private as it gets. So if you have something to share with us, go ahead.

SR: It's all right. It's concerning my oldest son. He's incarcerated now at L.A. City Jail. About eight months ago he was seen in the area, and he was talking to this guy, and he didn't know that he was a drug dealer, so he says. But he drinks. He doesn't do drugs. And it was about 11:00 o'clock at night and the sheriff came up. I think it was the sheriff I've only been in L.A. two years, but it was off of Century [Blvd.] or something, and [the sheriff] arrested him. And [the sheriff] took him to Inglewood saying that he had cocaine or something. Picked it up off the ground at 11:00 o'clock at night, took him to Inglewood Jail, and they put a $95,000—

Court: Bail.

SR:—Bail, like that. So then they offered him a deal, three years or something like that, and he refused. So he wound up in—He said, "Well, I'm go-

ing to have to fight myself." See, he didn't trust the public defender, you know. That's what he [said]. So he went pro per.

Court: I see.

SR: Anyway, he's been going pro per now about eight months, and he's done well.

Court: He's still fighting his case?

SR: Right.

Court: Are you going to be a witness in that case?

SR: No.

Court: Do you know if your son is going to call you, for example, as a character witness?

SR: Me?

Court: Yes.

SR: No, he's not going to have a trial.

Court: He's not?

SR: They've filed—a couple of days ago, they decided to let him get out in May and just close the file out. They are not going to charge him.

Court: They are not going to charge him further in this case?

SR: No.

Court: He's done?

SR: He's done as of May.

Court: Do you feel he's been treated fairly?

SR: At first I didn't, but now I feel better about it because the D.A. said that she would do what she could, and he talked with her, and I feel okay now about it.

Court: Do you feel you can be fair in this case?

SR: Oh, yes.

Court: Okay. Fine. Well, thank you very much for sharing that with us. Is there anything else you want to share with us?

SR: That's it.

After this exchange, the judge and lawyers held a short conference away from

the jurors. The prosecutor asked the court for clarification about SR's employment. The judge incorrectly replied that SR was a flight attendant.

The prosecutor later used her sixth peremptory challenge to excuse SR. In response, defense counsel voiced an objection and stated that she wanted to make a *Wheeler* motion[2] because SR was the second black person to be excused from the jury.[3] Defense counsel stated:

> I do not believe there is any particular reason to dismiss [SR] other than the fact that she is a black woman. She has had—as far as I can see, she was someone who has a daughter who was robbed. If it was me, I would not be kicking her, and assuming that she has a son who was pro per in county jail, I don't believe that there's any other reason.

The court then stated, "given the makeup of the pool and the fact that we only have two black jurors for this entire pool, I'll require a response from the prosecutor." The prosecutor replied:

> The fact that her son is being incarcerated, and, Judge you did ask her whether she thought she was being treated fairly by the system. She said no, she did not feel she was being treated fairly by the system and she did not trust the system. And she also said that she worked as an airline stewardess. The woman is in court, and she's probably about five foot one, and she's heavyset.

After the judge and defense counsel informed the prosecutor that SR never claimed to be a stewardess, the prosecutor continued:

> And the third problem with her was the judge asked the entire group of eighteen whether anybody was working or has the opportunity to be in a decision-making capacity, and she said that she was

not in a decision-making capacity with her work or her home or whatever. And that concerns me that [what] she's going to be doing here is in a decision-making capacity.

The judge then denied defense counsel's motion stating, "I find that's an articulable basis for the prosecutor's exercise in a good faith challenge."

### 2. *Prospective Juror JH*

JH was a research drug information pharmacist at the Veterans Administration and a consultant for a drug rehabilitation center in Echo Park. She was also about to publish a book. She was married and had no children. Her husband was a manager at a computer graphics special effects company. JH had been on a civil jury in the past that had reached a verdict. When the court asked her to be more specific about her job duties, she replied:

> Well, a[t][the] VA, I sit on the committee who decides what drug we're going to use for the region, train pharmacy residents and students. I sit on the institution of [the] review board committee. That's the one that determines whether you can do research on human subjects or whether they need to change it or anything like that. Also in very select cases I sometimes will make drugs for different research studies. For my job at the consultant company, I review the policy and procedures at the clinic, make sure that they dispense the drugs correctly and are following the state laws.

Following her answer, the judge complimented her, stating, "That's about the best job description I have heard a juror give in a long time." JH then added that she had once testified as an expert witness in front of a federal board of investigation, in connection with human research. The follow-

**2.** In California, a *Wheeler* motion is the procedural equivalent of a federal *Batson* challenge. *See Tolbert v. Page,* 182 F.3d 677, 679 (9th Cir.1999) (en banc); *People v. Wheeler,* 22 Cal.3d 258, 148 Cal.Rptr. 890, 583 P.2d 748 (1978).

**3.** As noted above, the prosecutor's peremptory challenge against the first black juror is not at issue in this appeal.

ing questioning occurred several minutes later:

Court: Back to the questioning of the others. [JH], there's something you would like to share with us?

JH: There are three attorneys in my family.

Court: Okay. And are these siblings, cousins, aunts, uncles?

JH: Cousins.

Court: And what kinds of law do they practice?

JH: Business law.

Court: All of them?

JH: Yes.

Court: Is there anything else you would like to share with us?

JH: One of my students was attacked by a patient, psychiatric patient.

Court: Were you present at the time?

JH: No.

Court: Okay.

JH: And one of our neighbors was held up at gunpoint, and one of my husband's co-worker's was held up at gunpoint.

Court: Did you witness any of these events?

JH: No.

Court: Did you attend any court proceedings in connection with them?

JH: No.

Court: Okay.

JH: And when I lived in Chicago when I was much younger, our house was robbed like five times.

Court: Okay. And was anyone apprehended?

JH: One of the times they were.

Court: Okay. Were you a witness?

JH: No.

Court: Do you feel that those matters were investigated appropriately by the local police department?

JH: One of them was not, I don't think.

Court: And why do you say it was not?

JH: Well, my father said it wasn't.

Court: Your father told you it was not? How old were you?

JH: Fourteen.

Court: That was a long time ago.

JH: Right.

Court: Have you ever personally had any unpleasant experiences with law enforcement?

JH: I have not, but I have friends who have.

Court: Friends. Have any of them been arrested?

JH: No.

Court: Have any of them sued the police department?

JH: No.

Court: Do you feel you could be fair to the district attorney in this case and the People?

JH: Yes.

Court: Do you feel you could be fair to the defendant?

JH: Yes.

Shortly after this exchange, the prosecutor used her ninth peremptory challenge to excuse JH. Defense counsel again objected, stating:

I'm renewing once again for the third time my *Wheeler* motion. The prosecution has kicked every black person that has gotten into the juror's seat with very weak reasons, I think. And I especially think it would be weak in this particular case. And in fact, the last person that was kicked [Juror SR], she kicked [her] for a reason that was not even a valid reason. I don't think there's any reason to—there's any reason to kick all three black jurors any more than there are anybody else. And the problem comes in when black jurors say they have had a problem with the police. And it happens a lot. This person says that—I'm sure that the prosecution is going to say, "Well, her father told her that, when she was 14, the investigation was not done well." And unfortunately, that happens in a lot of the minority communities. I don't think that's a good reason to kick people and it has happened three times

to all three black jurors who were called before this court. And I believe that she's doing it because my client is a black client. We're going to end up with no black jurors on the panel, and I think that that is not a jury of his peers and I think that's not justified.

The judge then asked the prosecutor to explain her selection. The prosecutor replied:

[T]he reason for this selection was actually several reasons. I think the thing that concerned me the most was in her free time—each one of these jurors have something they do in their free time—and in her free time, she works at a drug program as a rehabilitation counselor. She's rooting for the underdog. She obviously would go out for the underdog, and the People have concerns in this case that she could possibly hang up the panel because she could be unfortunately rooting or trying to help the underdog to the extent that she may bend over backwards to him in an unusual way.

The People's peremptories, I think, have been consistently exercised, and the People have had problems in the past with just overly educated jurors. We kicked off a professor and anybody who came across overly educated. Her response to the questions, she didn't speak in ordinary language. She had some highly intellectual answers, and just her responses to the questions were not consistent with the other jurors. So there's this feeling on part of the People that when she got back in the jury room that there would not be this relationship that I believe the People are trying to establish, and that is we're trying to find 12 people that will get along with each other and that could relate to each other. And she obviously is a research person, and she was on a different wave length, which is the exact same reason that the professor on this case was excused.

Also there was a number of concerns in her body language toward the People. She was sitting in the front row right towards the People. She had her elbow on her chair.

The judge replied:

Body language as of a couple of days ago isn't, at least in California, something that is sufficient, but your other reasons—all but the other reasons may be rather unusual. Nevertheless, you have articulated a basis which I find to be a good faith articulation of your reasons. And therefore the ... *Wheeler* motion is denied.

Defense counsel replied, "I do not know if it's a miscommunication or the prosecutor cannot hear or what, but [JH] says she was not a counselor. She was making sure they followed the law when they prescribed drugs. So she has no direct contact with anybody." The judge replied, "*I'm not here to second guess [the prosecutor's] reasons.*" (emphasis added).

## II

We review de novo a district court's decision to grant or deny a petition for a writ of habeas corpus. *See Bonin v. Calderon,* 59 F.3d 815, 823 (9th Cir.1995). We review a district court's findings of fact for clear error. *See id.*

McClain's habeas petition, filed on December 1, 1997,[4] is governed by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act ("AEDPA"). Section 2254 now provides:

(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim-

(1) resulted in a decision that was contrary to, or involved an unreasonable

---

**4.** AEDPA became effective April 24, 1996. *See Jeffries v. Wood,* 114 F.3d 1484, 1499 (9th Cir.1997) (en banc).

application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

Section 2254 further states that "a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

■ The Supreme Court recently clarified § 2254(d)(1)'s "contrary to" and "unreasonable application" clauses. *See Terry Williams v. Taylor,* — U.S. —, — — —, 120 S.Ct. 1495, 1518–25, 146 L.Ed.2d 389 (2000).[5] The Court held that a state court decision is contrary to clearly established federal law "if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts." *Id.* at 1523. A state court decision is an unreasonable application of clearly established federal law "if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* "Stated simply, a federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable." *Id.* at 1521.

**5.** On April 18, 2000, the Supreme Court issued two separate AEDPA opinions in which the petitioners had the same last names. Both cases originated in the Commonwealth of Virginia. *Terry Williams v. Taylor,* — U.S. —, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) involves § 2254(d)(1); *Michael Wayne Williams v. Taylor,* — U.S. —, 120 S.Ct. 1479, 146 L.Ed.2d 435 (2000) involves § 2254(e)(2). Only *Terry Williams v. Taylor* is relevant to this appeal.

## III

■ McClain contends that the prosecutor used peremptory challenges to remove blacks from the jury in violation of the Equal Protection Clause as articulated in *Batson.* "The Equal Protection Clause guarantees the defendant that the State will not exclude members of his race from the jury venire on account of race."[6] *Batson,* 476 U.S. at 86, 106 S.Ct. 1712. "[T]he State's privilege to strike individual jurors through peremptory challenges ... is subject to the commands of the Equal Protection Clause."[7] *Id.* at 89, 106 S.Ct. 1712.

■ Analysis of a *Batson* claim involves a three-step process. The defendant must first make a prima facie showing that the prosecution exercised its peremptory challenges based on race. "Once the defendant makes a prima facie showing, the burden shifts to the State to come forward with a neutral explanation for challenging black jurors." *Id.* at 97, 106 S.Ct. 1712. Finally, if the first two steps are satisfied, the court must determine whether the defendant has carried his ultimate burden of proving purposeful discrimination. *See Stubbs v. Gomez,* 189 F.3d 1099, 1104 (1999) (citing *Hernandez v. New York,* 500 U.S. 352, 359, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991) (plurality opinion)).

### A. Prima Facie Case

■ To establish a prima facie case, the defendant must show that "he is a member of a cognizable racial group," *Batson,* 476 U.S. at 96, 106 S.Ct. 1712, and that "the facts and circumstances of the case 'raise an inference' that the prosecu-

**6.** In *Powers v. Ohio,* 499 U.S. 400, 402, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991), the Supreme Court eliminated the requirement that the defendant and the stricken juror share the same race.

**7.** In *United States v. De Gross,* 960 F.2d 1433, 1440 (9th Cir.1992) (en banc), we held that *Batson* also applies to discriminatory peremptory challenges exercised by the defendant.

tion has excluded venire members from the petit jury on account of their race." *Wade v. Terhune,* 202 F.3d 1190, 1195 (9th Cir.2000) (internal citations omitted). We "review a trial court's *Batson* prima facie determination deferentially." *Tolbert v. Page,* 182 F.3d 677, 684 (9th Cir.1999) (en banc). In ruling on McClain's *Batson* motions, the state trial court determined that McClain made a prima facie showing that the prosecutor had exercised peremptory challenges on the basis of race. We agree.

### B. Race–Neutral Reasons

 At the second step in the *Batson* analysis, the burden shifts to the prosecution to articulate a race-neutral explanation for the exercise of the peremptory challenge in question. *See Batson,* 476 U.S. at 97, 106 S.Ct. 1712. We review de novo a trial court's holding that a proffered reason is race-neutral. *See United States v. McCoy,* 23 F.3d 216, 217 (9th Cir.1994).

 "A neutral explanation in the context of our analysis here means an explanation based on something other than the race of the juror." *Hernandez,* 500 U.S. at 360, 111 S.Ct. 1859. "At this step of the inquiry, the issue is the facial validity of the prosecutor's explanation. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race-neutral." *Stubbs,* 189 F.3d at 1105 (quoting *Hernandez,* 500 U.S. at 360, 111 S.Ct. 1859).

 McClain *concedes* that the prosecutor offered race-neutral reasons for her exercise of peremptory challenges against prospective Jurors SR and JH. The prosecutor told the court that she excluded SR from the jury because: (1) her son was incarcerated and SR "did not feel she was being treated fairly by the system and she did not trust the system;" (2) the prosecutor believed that she lied about being a stewardess because she was heavyset; and (3) SR "said that she was not in a decision-making capacity with her work or her home or whatever." The prosecutor told the court that she excluded JH from the jury because: (1) during her

free time she "worked at a drug program as a rehabilitation counselor" and thus was "rooting for the underdog"; (2) she was "overly educated," "didn't speak in ordinary language," and gave "highly intellectual answers," and thus would not be able to get along with the other jurors; and (3) "her body language towards the People" was unacceptable in that "she was sitting in the front row right towards the People [ ] and had her elbow on her chair." Because McClain concedes that the prosecutor's reasons were facially race-neutral, we turn to the pertinent issue-whether McClain met his burden of proving that the prosecutor engaged in purposeful discrimination against Jurors SR and JH.

### C. Evidence of Purposeful Discrimination

 At the final step of the *Batson* analysis, "the trial court must determine whether the defendant has carried his burden of proving purposeful discrimination." *Hernandez,* 500 U.S. at 359, 111 S.Ct. 1859. The trial court has a duty to determine the credibility of the prosecutor's proffered explanations. *See Jordan v. Lefevre,* 206 F.3d 196, 200 (2d Cir.2000). A finding of discriminatory intent turns largely on the court's evaluation of the prosecutor's credibility. *See Batson,* 476 U.S. at 98, n. 21, 106 S.Ct. 1712. We review for clear error the trial court's finding that the prosecutor did not purposefully discriminate. *See Stubbs,* 189 F.3d at 1106.

 A prosecutor's motive may be inferred from the totality of the relevant facts. *See Hernandez,* 500 U.S. at 363, 111 S.Ct. 1859 (citing *Washington v. Davis,* 426 U.S. 229, 242, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976)). A prosecutor's motives may be revealed as pretextual where a given explanation is equally applicable to a juror of a different race who was not stricken by the exercise of a peremptory challenge. *See Caldwell v. Maloney,* 159 F.3d 639, 651 (1st Cir.1998). "A comparative analysis of jurors struck and those remaining is a well-established tool for ex-

ploring the possibility that facially race-neutral reasons are a pretext for discrimination." *Turner v. Marshall,* 121 F.3d 1248, 1251 (9th Cir.1997). Peremptory challenges cannot be lawfully exercised against potential jurors of one race unless potential jurors of another race with comparable characteristics are also challenged. *See id.*

In addition, the persuasiveness of the prosecutor's justifications for exercising peremptory strikes is relevant. *See Purkett v. Elem,* 514 U.S. 765, 768, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995) (per curiam). "[I]mplausible or fantastic justifications may (and probably will) be found to be pretexts for purposeful discrimination." *Id.* Where the facts in the record are objectively contrary to the prosecutor's statements, serious questions about the legitimacy of a prosecutor's reasons for exercising peremptory challenges are raised. *See Caldwell,* 159 F.3d at 651 (stating that serious questions of pretext are raised where the facts in the record are simply objectively contrary to the prosecutor's statements); *Johnson v. Vasquez,* 3 F.3d 1327, 1331 (9th Cir.1993) (stating that courts are not bound to accept neutral reasons that are either unsupported by the record or refuted by it). The fact that one or more of a prosecutor's justifications do not hold up under judicial scrutiny militates against the sufficiency of a valid reason. *See United States v. Chinchilla,* 874 F.2d 695, 699 (9th Cir.1989) (stating that, although reasons given by prosecutor "would normally be adequately 'neutral' explanations taken at face value, the fact that two of the four proffered reasons do not hold up under judicial scrutiny militates against their sufficiency").

1. *Prospective Juror SR*

The first two reasons given by the prosecutor for using a peremptory strike against SR were objectively contrary to the facts. The third reason is revealed as pretextual upon conducting a comparative analysis of SR with another juror.

The prosecutor first justified striking SR from the jury by attributing to SR beliefs that she did not hold. The prosecutor stated that SR mistrusted the system and that SR believed that she had been treated unfairly. But the record indicates that SR never said that she was treated unfairly or that she did not trust the system. In discussing her son's arrest, SR stated that her son did not trust the public defender. SR also stated that, although she initially believed that her son had been treated unfairly, she changed her mind and no longer believed this. The court responded by asking SR, for the second time during voir dire, if she could be a fair juror in the present case. SR stated unequivocally that she could be fair.

The prosecutor's second reason for excluding SR was based on the prosecutor's speculation that because SR was heavyset, she must have lied about being a stewardess. This was also an illegitimate reason for excluding SR. SR never claimed to have worked as a stewardess, she simply stated that she worked in airline maintenance. The California appellate court also found that the first two reasons given by the prosecutor for using a peremptory strike against SR (SR stated she did not trust the system and SR lied about being a stewardess) were not supported by the record.

The prosecutor's last reason for excluding SR, and the sole reason the California appellate court upheld the trial court's decision, was that she lacked decision-making experience. This reason is revealed as pretextual upon conducting a comparative analysis of SR with another juror. Here, prospective Juror MG, a non-black juror, was impaneled even though he had never served on a jury and had no significant group decision-making experience. The following colloquy occurred between the court and Juror MG:

Court: [MG], you mentioned that you have never been on jury duty.

MG: Never.

Court: Have you ever served on a committee that is called upon to make decisions about any subject whatsoever?

MG: No.

Court: Really?

MG: Yes, just in my office, just in my office.

Court: And what kind of committee do you serve on in your office?

MG: I'm a tour controller, and most of the problems they have, it's like they cannot get any hotel or they cannot get any car, and they ask me how they can get it. And I use my experience and use the time and then contact with the people I know, and then I get for them what they want, and it works like that.

Court: Are you involved in any community organizations or church?

MG: Sometimes.

Court: What kind of organizations?

MG: Just like temple.

Court: And?

MG: And then like when they have a ceremony or something else that they need people to help or control the traffic, I do sometime.

Court: Do you have any kind of leadership role in your temple?

MG: No, I just volunteer myself.

Court: Thank you, [MG].

This colloquy reveals that the prosecutor's peremptory strike against prospective Juror SR was pretextual. The prosecutor justified her peremptory strike against SR because she had no group decision-making experience. Yet the prosecutor failed to exercise a peremptory strike against MG, a non-black juror who also had no group decision-making experience. This comparison between SR and MG fatally undermines the credibility of the prosecutor's stated justification. *See Chinchilla,* 874 F.2d at 695 (holding that an appellate court may overturn the finding of the trial court where a comparison between the answers given by prospective jurors who were struck and those who were not fatally undermines the prosecutor's credibility). If the statement was genuine and not merely pretextual, the prosecutor would have excluded MG on the same basis, which, of course, she did not.

We conclude that the trial court's decision that McClain did not meet his burden of proving intentional discrimination with respect to Juror SR, "was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. 2254(d)(2).

2. *Prospective Juror JH*

 The prosecutor's stated reasons for exercising a peremptory challenge against JH were also objectively contrary to the facts. *See Caldwell,* 159 F.3d 651. The prosecutor's first justification for exercising a peremptory challenge was that because JH volunteered as a counselor at a drug program, she would "root for the underdog." This reason is entirely without support in the record because, as the defense counsel pointed out to the judge, JH was not a "rehabilitation counselor" for a "drug program,"—she was a "research drug information pharmacist" at the VA.

The prosecutor next asserted that because JH "didn't speak in ordinary language," and gave "highly intellectual answers," she would not get along with the other jurors. But contrary to the prosecutor's assertion, a review of the transcript reveals that JH did speak in ordinary language and that her answers were not "highly intellectual." Although the prosecutor stated that she feared JH would not be able to get along with the other jurors because she was "overly educated," this was directly contradicted by the record as well. During voir dire, JH stated that she had previously served on a jury that had reached a verdict.

In addition, this reason is revealed as pretextual upon conducting a comparative analysis of JH with several non-black prospective jurors who could be considered "overly educated" but were nonetheless impaneled. The prosecutor did not exer-

cise a peremptory challenge against a structural engineer, an accountant, or a federal income tax appeals officer.

■■■■■ The prosecutor's last reason for excusing JH was that JH's body language was unacceptable because she had her elbow on her chair. This explanation, without more, cannot be considered a reasoned explanation. It is not at all apparent why the prosecutor assumed that, because JH had her elbow on her chair, she would be unfavorably disposed towards the prosecution. The fact that a prosecutor's assertions cannot even pass as reasoned explanations may indicate that they are pretextual. See Caldwell, 159 F.3d at 651. Although some California authority indicates that body language may be a valid reason to exercise a peremptory challenge, those cases are distinguishable on their facts. See People v. Dunn, 40 Cal.App.4th 1039, 1047, 47 Cal.Rptr.2d 638 (1995) (finding no error where prosecutor excused black prospective juror because, among other reasons, she was frowning and appeared to lack any interest in the proceedings); People v. Turner, 8 Cal.4th 137, 170, 32 Cal.Rptr.2d 762, 878 P.2d 521 (1994) (finding no error where prosecutor excused black prospective juror because, among other reasons, she appeared hostile, had a defensive body position and would not look at the prosecutor). For example, in Dunn and Turner, the prosecutor explained the significance of the prospective juror's particular body language, which consisted of substantially more than a juror having her elbow on her chair. In addition, in these cases there were other legitimate reasons to fear that the prospective jurors would be biased. In contrast, here the prosecutor did not explain the significance of JH's body language. Striking JH on the sole basis that she had her elbow on her chair is patently frivolous. Unlike in Dunn and Turner, the prosecutor did not explain the significance of JH's chair-resting elbow or otherwise indicate how that gesture evidenced bias. Furthermore, in Dunn and Turner, the legitimacy of the proffered justification was supported by the fact that ultimately

members of the minority group were seated on the jury panel, unlike the situation here. In the present case, the seriously disproportionate exclusion of blacks from the jury venire is powerful evidence of intentional race discrimination. See Batson, 476 U.S. at 93, 106 S.Ct. 1712 (quoting Washington v. Davis, 426 U.S. at 242, 96 S.Ct. 2040).

Thus, each of the prosecutor's justifications for striking JH from the jury was either contrary to the record or nonsensical. Nonetheless, the trial court stated that, although the prosecutor's stated reasons for striking JH were "rather unusual," she "articulated a basis which I find to be a good faith articulation of [her] reasons." After defense counsel informed the trial judge that JH was not a drug counselor, the judge replied, "I'm not here to second guess [the prosecutor's] reasons." In making this statement, the trial court abdicated its duty to make an ultimate determination on the issue of discriminatory intent based on all the facts and circumstances. See United States v. Alvarado, 923 F.2d 253, 256 (2d Cir.1991) (remanding, in part, because magistrate failed to make an ultimate determination on the issue of discriminatory intent based on all the facts and circumstances).

■■■ We conclude that the trial court's decision that McClain did not meet his burden of proving intentional discrimination with respect to Juror JH was also "based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. 2254(d)(2). Furthermore, the court's refusal to "second-guess" the prosecutor's reasons for exercising a peremptory challenge against JH was "contrary to clearly established Federal law as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). The Supreme Court held in Batson that a trial court has "the *duty* to determine if the defendant has established purposeful discrimination." 476 U.S. at 98, 106 S.Ct. 1712 (emphasis added).

## IV

McClain has established that the prosecutor's proffered explanations were a pretext for excluding SR and JH from the jury because of their race.

Four of the six reasons the prosecutor gave for striking Jurors SR and JH were contrary to the facts (i.e., SR stated that she did not trust the system and she lied about her employment; JH stated she was a rehabilitation counselor; JH did not speak in ordinary language and would not get along with other jurors). We conclude that still other reasons were pretextual based upon comparisons of voir dire responses by non-black jurors who were seated without objection by the prosecutor (SR lacked decision-making experience; JH was overly educated). Yet another offered justification was nonsensical (JH had her elbow on her chair). In addition, the fact that all blacks in the venire pool were struck raises an inference of discrimination. *See id.* at 97, 106 S.Ct. 1712 (stating that "a 'pattern' of strikes against black jurors included in the particular venire might give rise to an inference of discrimination"). We therefore hold that McClain was denied the right to a fair trial in violation of the Equal Protection Clause.

The state trial court's refusal to "second-guess" the prosecutor's reasons for exercising a peremptory challenge against JH was "contrary to clearly established Federal law." 28 U.S.C. § 2254(d)(1). Furthermore, McClain has shown by "clear and convincing evidence" that the state trial court's finding that the prosecutor did not purposefully discriminate in exercising peremptory challenges against Jurors SR and JH, "was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. 2254(d)(2).

Accordingly, we REVERSE the district court's denial of McClain's habeas petition, and REMAND the case to the district court with instructions to grant the writ unless the State of California grants McClain a retrial within a reasonable period to be set by the district court.

REVERSED and REMANDED with directions.