**Caleb ELLIS, Petitioner–Appellant,**

v.

**Anthony C. NEWLAND, Warden, Respondent–Appellee.**

No. 99–17353.

D.C. No. CV–96–04397–MMC.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Nov. 7, 2001.

Decided Nov. 26, 2001.

---

Before NOONAN, HAWKINS and TASHIMA, Circuit Judges.

## MEMORANDUM *

Petitioner Caleb Ellis ("Ellis") argues first that the prosecutor used his peremptory challenges to prevent three African–

* This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by Ninth Circuit Rule 36–3.

American jurors from serving, violating the Equal Protection Clause of the Fourteenth Amendment, as articulated in *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).

The factual findings of the state trial court, which include the ultimate finding that the prosecutor did not purposefully discriminate, are presumed correct and may only be set aside if the petitioner presents clear and convincing evidence that rebuts that presumption. 28 U.S.C. § 2254(e)(1).

■ One of the potential jurors, Ms. Ivory, was challenged on account of her slow and halting answers to questioning. The trial judge observed that Ms. Ivory's demeanor evidenced that "she was not quite familiar with what was going on, maybe misunderstood it." In the context of a murder case, where attentive and active listeners are essential, the trial court's assessment weighs heavily and we conclude there was no *Batson* violation here.

■ With regard to Ms. Wells and Ms. Moore, the prosecutor based his challenge on their having relatives currently serving in penitentiaries. The Supreme Court has said: "A neutral explanation ... means an explanation based on something other than the race of the juror.... Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race-neutral." *Hernandez v. New York*, 500 U.S. 352, 360, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991) (plurality opinion). The prosecutor's reason for challenge qualifies as a legitimate reason under *Purkett v. Elem*, 514 U.S. 765, 769, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995). Thus, the record supports the district court's conclusion that there was no "bias on the prosecution's part in accepting these jurors but striking the others."

Ellis, however, argues further that since African–Americans are more likely to have relatives currently in prison, allowing this prosecutor's justification ultimately creates what might be called a "proxy" for an exclusion based on race—i.e., a criterion so closely related to race that it ceases to be race-neutral and becomes "a surrogate for impermissible racial biases." *Stubbs v. Gomez*, 189 F.3d 1099, 1106 (9th Cir.1999) (citing *United States v. Bishop*, 959 F.2d 820, 826 (9th Cir.1992)).

Since Ellis did not offer statistical evidence to this point before the state trial court, and because we do not find Ellis's statistical evidence before this Court sufficiently "clear and convincing," we do not think the presumption of correctness surrounding the trial court's determination that there was no discriminatory intent has been rebutted. The disparate impact argument now advanced by Ellis has not been accepted by the Supreme Court in its analysis of *Batson* and its progeny, all of which focus on *purposeful* discrimination. *See Hernandez*, 500 U.S. at 375 (O'Connor, J., concurring) ("No matter how closely tied or significantly correlated to race the explanation for a peremptory strike may be, the strike does not implicate the Equal Protection Clause unless it is based on race .... *Batson* ... does not require that the justification be unrelated to race."). Finally, it is not insignificant that two other African–American women did serve on the jury. While this alone does not insulate the prosecutor's conduct from *Batson* scrutiny, it cuts in favor of the trial court's ultimate determination that the prosecutor acted in a race-neutral manner. *See Burks v. Borg*, 27 F.3d 1424, 1429 (9th Cir.1994).

■ Ellis also contends that he was not timely informed that he would face a felony-murder charge, in violation of his Sixth Amendment right to be "clearly informed of the nature and course of the charges in order to permit adequate preparation of a defense." *Stephens v. Borg*, 59 F.3d 932,

934 (9th Cir.1995). This claim asks us to ignore that the charging document required Ellis to prepare and defend against kidnaping and robbery, either of which would allow a felony-murder theory. Moreover, in this case, there was substantial evidence of felony-murder adduced at trial and various mentions of felony-murder, both before and during trial, such that the defendant should have been alert to the possibility of a felony-murder instruction. *See Stephens*, 59 F.3d at 935 (ruling sufficient constitutional notice exists if prosecutor presents at trial substantial evidence of burglary in his case-in-chief and informs the defendant of a potential felony-murder instruction while defense is putting on its case); *Morrison v. Estelle*, 981 F.2d 425, 427 (9th Cir.1992).

■ Next Ellis contends that his right to due process was violated because the trial court excluded two types of impeachment evidence. State court evidentiary rulings are not subject to habeas review unless they are so prejudicial as to violate fundamental due process and the right to a fair trial. *Tinsley v. Borg*, 895 F.2d 520, 530 (9th Cir.1990).

Ellis challenges the trial court's preclusion of cross-examination of Cornish, one of the victims, regarding prior statements he made about the whereabouts of Ellis's car at the time of the crime. Because cross on this matter was thwarted, Ellis claims he could not bring in testimony from a mechanic attesting that Ellis's Delta 88 was in the shop the night of the attacks. The trial court acted within its discretion in preventing challenges to Cornish's prior statements regarding Ellis's Delta 88.

At trial, Cornish said that everyone left the basement and turned right, except Ellis, who turned left. Cornish testified that Ellis said he would follow them. Cornish never mentioned that he saw petitioner driving a Delta 88, or that he saw Ellis

enter or even approach his vehicle. Hence, there would be little probative value of impeachment in bringing out statements by Ellis's mechanic to the effect that the Delta 88 was in the shop that night.

■ Also excluded was testimony by Eric Smith about Cornish's credibility. Ellis challenges the exclusion of Eric Smith's testimony, which, he contends, would have shown Cornish's reputation for mendacity. The trial court deemed that the slight probative value of this evidence was substantially outweighed by the undue consumption of time it could take. Ellis says that this case, despite the testimony of others and the physical evidence, hinges on Cornish's direct testimony and that being deprived of the opportunity to test the credibility of Cornish's testimony effectively deprived him of his defense.

But the testimony of Eric Smith would have virtually no probative value in determining whether Ellis participated in the evening's events. It would have only been collaterally probative by casting doubt on Cornish's credibility, but no direct relevance would be established to this case. Its reliability was also uncertain: Smith himself had engaged in criminal activity (buying drugs from Cornish) and the defense had not laid any foundation for why Smith's testimony should be credited, for example, how long and why Smith knew Cornish, or how Smith arrived at his knowledge of Cornish's reputation in the community for untruthfulness. The jury could only consider Smith's testimony after what would probably be a mini-trial regarding other drug dealings and shootings to determine the basis and foundation for Smith's testimony. This would risk confusing the jury in an already lengthy trial. Further, Smith's testimony was not the sole evidence on either Ellis's participation or Cornish's credibility. Finally, Smith's testimony may have been a part of Ellis's

reasonable doubt defense, but there were many other items designed to elicit that doubt (no one put Ellis at the shooting, and his girlfriend gave him an alibi). Presumably, if Smith were a major part of the defense's strategy, defense counsel would have spent more time developing the foundation for Smith's testimony.

Additionally, we are required to balance the weight in favor of inclusion against the state's interest in exclusion, which here takes the form of trying to limit the number of side issues and delays that might arise from permitting Smith's testimony. "Evidence of little importance, whether merely cumulative or of little probative value, will almost never outweigh the state interest in efficient judicial process." *Perry v. Rushen,* 713 F.2d 1447, 1453 (9th Cir.1983). Because there was no constitutional error in excluding the testimony, there is no need to consider whether there was a substantial effect on the jury's verdict.

■ Finally, Ellis claims he was constitutionally prejudiced by the jury's consideration of a newspaper article during its deliberations. Even excepting the procedural defects of this claim, we find that one aspect of the article challenged by Ellis was harmless because the jury already heard the same thing by the prosecutor in his closing argument. Whether the statement was unduly inflammatory or contrary to the evidence at trial is beside the point if it merely repeats exactly what the jury heard at trial. The second statement Ellis challenges from the article was that the defendants could face the death penalty if convicted of first degree murder with special circumstances of robbery and kidnaping. This, Ellis claims, was potentially prejudicial *misinformation* because the statement that defendants "faced the ultimate sanction could have influenced the jury's perception of the nature of the crime."

The trial court, however, told the jury that this was not a death penalty case. The jurors were also told not to consider any facts from any source aside from the trial and they were also told not to consider the subject of punishment. Given what the jurors heard in the courtroom from both the prosecutor and the judge and the strong presumption that jurors follow the instructions of the court, we affirm the district court's ruling on this matter.

**AFFIRMED.**