Filed 12/7/21  P. v. Jones CA1/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>ROBERT EARL JONES, JR.,<br><br>        Defendant and Appellant. | A152863<br><br>(Contra Costa  County<br>Super. Ct. No. 5-151182-3)<br><br>**ORDER MODIFYING OPINION<br>[NO CHANGE IN JUDGMENT]** |

**BY THE COURT:**

It is ordered that the opinion filed herein on November 17, 2021, be modified as follows:

On page 15, in the first sentence of the first full paragraph, delete the word "*Jones*" and replace with "*Unzueta*," so that the sentence reads:

Here, unlike in *Avila* and *Unzueta*, the trial court found there was no prima facie showing of discrimination, and Jones does not contend otherwise.

This modification does not effect a change in the judgment.


Dated: _____                          _____ Stewart, Acting P.J.


1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br>v.<br>ROBERT EARL JONES, JR.,<br><br>    Defendant and Appellant. | A152863<br><br>(Contra Costa  County<br>Super. Ct. No. 5-151182-3) |

Defendant Robert Earl Jones, Jr. appeals his convictions for first degree robbery, burglary, and false imprisonment.  Jones contends the verdicts must be overturned due to errors in jury selection and in the improper limitation of his right to confrontation and presentation of evidence.  We affirm.

## BACKGROUND

We provide a brief version of the facts here and additional factual and procedural details in the discussion of Jones's specific claims.

## I.

### *Prosecution Case*

In January 2015, Jessica Williams lived in a house in Richmond with her boyfriend Manuel Benitez, eight-year-old son John Doe, and five-month-old daughter; Williams's sister and nephew also lived at the house.  Benitez grew marijuana in the backyard.  Benitez had known Jones since childhood.

1

Williams first met Jones, who was introduced to her as "Rob," in January 2015 or possibly in December 2014, when he visited for three days and slept on her couch. She knew him as "Rob," Benitez's childhood friend. Williams and Jones got along well during his stay; they watched television, and ate breakfast, lunch and dinner together. Jones and Williams "listened to some music that he—rapped." He left on good terms, thanking Williams for her hospitality. Williams next saw Jones in late March 2015, when he visited in the early morning hours and spoke with Benitez. After speaking with Jones, Benitez's mood was "normal." Williams did not see Jones again until April 8, 2015.

On April 8, 2015, around 10:00 p.m., Williams, who was then pregnant, was home alone with her children, when she heard a knock at her front door. John Doe looked out the window and said a "black girl" was at the door. With her daughter in her arms, Williams opened the door and saw an unknown woman standing in the doorway. The woman at the door asked for Williams's boyfriend by his nickname, Manny; only Benitez's childhood friends called him "Manny." Williams said Benitez was not home and asked the woman who she was. The woman claimed to be pregnant with Benitez's child. As Williams turned and looked towards her house, two men with guns ran toward her. Williams recognized Jones as one of the men.

Jones was dressed all in black and wore a hood, which "was coming down" as he ran. The other man also was dressed in black and wore a mask covering his face from his nose down. Williams ran to the living room and was able to put her daughter in a highchair. The men tackled Williams to the floor, and Jones threatened to shoot her and her children if she screamed.

The men tied Williams's hands behind her back with a zip tie and shoved her into her bedroom. The men repeatedly asked her where the

money and "shit" were. Williams directed them to a dresser drawer and a closet. There was about $700 in the drawer; the closet had two large duffle bags with marijuana. The men took the money and duffle bags and asked for more. When Williams said there was no more, Jones fired one shot toward the floor inches away from Williams—who was on her knees—and hit her on her head with the gun, causing a laceration on her head that later had to be closed with staples. Jones then pushed Williams into the closet and closed the door.

Shortly after she was forced into the closet, Williams heard her son scream that the intruders had left. Williams kicked open the closet door and ran to her children. With her son's help, Williams was able to untie herself and called 911. Williams told the 911 dispatcher that five minutes earlier Rob—"one of [her] boyfriend's old friends," and another man had attacked her in her home. Williams said, "I am scared they are going to come back. [¶] . . . [¶] I am scared. I'm nervous they are going to come. . . . The guy, he knows that I know who he is, so I'm nervous." Williams told the dispatcher that Jones had "spent the weekend . . . at [her] house with [her] boyfriend" and that that is how she "knew him." She repeated, "I knew who he was and we had talked a lot and that's who came running in the house right now and oh my god . . . he was in my house a couple weeks ago."

At 10:25 p.m. on the night of the attack, Jones sent a text message to someone named "Baby," saying "21 pounds I'm riding with." Jones was arrested nine days later on April 17, 2015.

## II.

### *Defense Case*

The defense called Williams's son, John Doe, who had recently finished fourth grade. Doe recalled there had been an incident the previous year,

where a woman came to the door. The woman mentioned Benitez, and Williams phoned Benitez and spoke with him for about a minute. After the phone conversation, two men dressed in black came into the house. Doe did not remember if the men wore hoodies but thought one of them wore a bandana over his mouth. He did not remember if the other man wore anything on his face. Doe did not know the race of the two men.

The men put Williams on the floor, zip-tied her hands behind her back, and brought her to the bedroom. Doe and his sister stayed in the living room with the woman. The man with the bandana went back and forth between the bedroom and living room while the other man stayed with Williams. The men and woman left; the men were carrying two duffle bags. Williams came into the living room and Doe helped cut off the zip tie.

Doe testified that Williams then called Benitez and spoke with him briefly. He said Benitez came home for three minutes and left before police arrived. Doe did not hear the conversation between Benitez and Williams. He said Williams called 911 after Benitez left. Doe testified he was frightened during the incident because one of the men had pointed a gun at him.

### III.
### *Prosecution Rebuttal*

Williams denied calling Benitez when the woman was at the door. She was holding her daughter and did not have her phone. The first call she made after the attack was to police. She called Benitez later, when police asked to speak with him. Williams went to the hospital and got home sometime around midnight. Benitez got home shortly after. Williams explained that this was the first time Doe and Benitez had seen other since before the crime.

4

## I.

### *Jury Selection*

Jones contends reversal of his convictions is required because the trial court erred in denying two defense *Batson/Wheeler*[1] motions challenging the prosecution's use of peremptory strikes to remove three out of the five available African-American jurors.  It is undisputed that Jones is African-American, as were all three challenged jurors.

### A. The Challenged Jurors

Before voir dire, prospective jurors filled out questionnaires that included basic demographic information and asked about a number of issues, including experience with crime and attitudes towards defense attorneys, prosecutors, and the criminal justice system.  Jury selection began on June 13, 2016.

#### 1. *Prospective Juror Rogers*

On June 15, 2016, the prosecutor exercised a peremptory challenge to excuse prospective juror Rogers.

Rogers was a retired nurse of 43 years, unmarried with no children. She had served on one criminal jury in a murder case that reached a verdict. Her regular news sources included television news and radio programs, news magazines, and the Internet.  She had been the victim of a home burglary; she did not feel this experience would affect her ability to have an open mind in the present case.  Her thoughts about defense attorneys, prosecutors, and the criminal justice system varied on the situation, facts, and individuals involved.

---

[1] *Batson v. Kentucky* (1986) 476 U.S. 79; *People v. Wheeler* (1978) 22 Cal.3d 258.

## 2. *Prospective Juror Thompson*

Thompson was a disability claims analyst, unmarried with one adult son. She had no prior jury experience. She stated she was a very honest person. In several areas in her juror questionnaire, Thompson wrote, " I don't know," including questions about where she obtained her news and her views about defense attorneys, prosecutors, and the criminal justice system.

During voir dire, the trial court questioned Thompson about the number of times she answered, "I don't know," in her questionnaire. She explained, "I was confused" and "I have never been on a jury before." The court responded that the questionnaire was intended to be answered by lay people, not people with legal training and with that in mind, did she have any answers other than "I don't know." She answered, "No." The court then picked a question from the questionnaire, "Do you have any negative feelings about the criminal justice system," to which she had answered, "I don't know." At that point, Thompson expressly stated, "That should have been 'no'." The court asked whether she thought the criminal justice system needs an overhaul, to which she said, "Yeah," but upon prompting, could not offer a specific reform "off the top of [her] head."

The prosecutor also asked about various questions in the jury questionnaire to which Thompson answered, " 'I don't know.'" He specifically asked whether she had opinions on how the criminal justice system treats defendants such as Mr. Jones, and she replied, "No, I don't." He further asked, "Do you have any opinions as to how this system treats victims or how the system treats people who are witnesses," and she replied, "No, I don't."

The prosecutor then paraphrased two other questions in the questionnaire, to wit: "If I don't prove my case as a Prosecutor, how would you vote, guilty or not guilty," and "If I did prove my case as a Prosecutor,

how would you vote, guilty or not guilty." He pointed out that Thompson had previously answered "I don't know" for both questions. He then asked her, "Having sat through jury service for the last few days, . . . if I proved my case . . . what would your vote be . . . [¶] . . . [¶] [i]f all of the evidence I put makes you believe beyond a reasonable doubt there was a crime?" Ms. Thompson replied, "If a crime was committed, it would be guilty if it was proven, yes."

The prosecutor asked about what her job entailed "behind the scenes," and she explained how she analyzed disability claims and had them evaluated by doctors when necessary. When asked whether she had direct contact with the people who submitted disability claims, she answered that she only reviewed their claims in paper form.

On June 20, 2016, after defense counsel expressed satisfaction with the jury, the prosecutor peremptorily challenged prospective juror Thompson.

### 3. *First Batson/Wheeler Motion*

Immediately after the prosecution peremptorily challenged prospective juror Thompson, defense counsel made a *Batson/Wheeler* objection, arguing: "This is the *second* African-American juror that [the prosecutor] has stricken. The first was Ms. Rogers . . . . [¶] And Ms. Thompson is the second, which does not sound so particularly noteworthy, except given the relative dearth of African-Americans in the courtroom . . . ." (Italics added.)

The trial court noted that there was "no question" that a group was established, as both Rogers and Thompson were African-Americans. Defense counsel opined that she thought it was appropriate for the prosecutor to be asked for his reasons, as opposed to defense counsel and the court speculating as to those reasons. The trial court then stated, "The way the case law works right now, I very rarely, in fact, the way—I don't remember the last time I

7

would have [the prosecutor], no, I don't want to hear from what you have to say rather *it seems to me there is not a prima facie case* I'm not going to say that because I think it's important for the reason for the excusal to be on the record." (Italics added.) The following colloquy occurred:

"[THE PROSECUTOR]: Yes, your Honor. I will start with Ms. Rogers. I would note she was my second—

THE COURT: She was not objected to.

[THE PROSECUTOR]: Then—

THE COURT: You don't have to explain Ms. Rogers just yet. Her excusal only is significant insofar as [defense counsel] is suggesting a pattern of conduct here where Ms. Thompson represents instance No. 2 of a pattern."

The prosecutor stated that he struck Thompson because he "did not like the way she was answering the questions" proposed to her. He asserted that during his voir dire, he got a number of answers of "I don't know" and commenting that "[i]t's the same thing we have with the college students who have no life experience." The prosecutor further explained, "when I'm thinking about my jury as a whole, I want a jury that has investment in their community, some investment in this case," continuing, "and she clearly when we were speaking to her she really did not have any opinions on anything." The prosecutor added, "So when every single question is answered, 'I don't know,' I don't think that person really gives us anything in the jury pool." The prosecutor claimed that he struck Mr. A. "for the same reason, he had no life experience and had very similar answers 'I don't know'," noting that, "The only difference between the two is Mr. A[.] is right out of high school going to college," and Ms. Thompson "has worked in the same job 26 years."

In response, defense counsel stated that "it's important to note that Juror No. 4, (*Juror No. 59), Juror No. 5, (*Juror No. 121), Juror No. 7

8

(*Juror No. 111) . . . all gave essentially 'no' answers to questions," and "all three of them left their questionnaires predominantly blank." None of those three jurors were African-American.

The trial court stated, "tentatively, I think the reasons stated for excusing Ms. Thompson are plausible, non-discriminatory, rational reasons to excuse her." The trial court reviewed questionnaires of certain jurors referred to by defense counsel and found the responses were "qualitatively different" from Thompson's responses. The court then overruled the objection as to Thompson.

### 4. *Prospective Juror Winston*

Winston was 22 years old, unemployed, unmarried, and without children. He had no prior jury experience. He had no feelings about defense attorneys and prosecutors. He also had no negative feelings about the criminal justice system or how it treats defendants.

During voir dire, the prosecutor commented that he had noticed Winston had been "asleep on the bench" outside the courtroom earlier and asked whether he was okay—"anything I should know?" Winston replied that he had not "been getting that much sleep as a result of just trying to find some work." When asked whether there was anything that would affect his ability to pay attention during the trial, he answered "No." The prosecutor stated, "I just need to be assured that you're not going to fall asleep on me in that chair," to which Winston replied, "No—I'm fine now."

At the conclusion of Winston's voir dire, the court interjected, stating, "you've got to stay awake," to which Winston replied, "Sorry."

On June 20, 2016, after defense counsel expressed satisfaction with the jury, the prosecutor exercised a peremptory challenge to excuse prospective juror Winston.

## 5. *Second Batson/Wheeler Motion*

Upon the prosecution's excusal of prospective juror Winston, defense counsel objected, arguing that Winston was "now the third African-American juror that [the prosecutor] has asked to excuse as a peremptory challenge." The trial court noted that Winston "obviously" was in a "cognizable class," and asked the prosecutor for his reasoning behind the excusal.

The prosecutor observed that Winston had fallen asleep during voir dire. He explained, "I think it's abundantly clear [to] everybody in the courtroom that . . . Mr. Winston is not paying attention at all. He fell asleep the minute after we stopped questioning him. He was asleep throughout the last juror's questions and everything. I saw him sleeping out on a bench outside and I questioned him about it. Your Honor brought up that he needed to stay awake." The prosecutor said he "noticed at least four different jurors looking at [Winston] as he was sleeping" and that Winston was "distracti[ng] . . . everybody around" by yawning and making noises. He stated, "The minute after the questions stopped [Winston] put his jacket on and just curled up on the chair and goes to sleep. I don't think this is someone who can be a juror in our case if he can't stay awake for five minutes."

Defense counsel opined that Winston's behavior was not uncommon, stating that dozing off was "a thing that jurors do when they are not being questioned." Defense counsel claimed that another juror (*Juror No. 111) was dozing off and looking down sometimes as if she were using an electronic device or book. She looked disinterested in the proceedings, but the prosecutor did not excuse her.

The trial court made a personal observation that Winston was the only person who nodded off or fell asleep during voir dire. The court found

10

Winston's inability to stay awake was "a big reason that the challenge here is a plausible non-discriminatory challenge."

## B. Applicable Law

Although a prosecutor may exercise a peremptory challenge to strike a prospective juror " 'for any reason, or no reason at all' " (*People v. Scott* (2015) 61 Cal.4th 363, 387 (*Scott*)), he or she may not use a peremptory challenge to " 'strike prospective jurors on the basis of group bias—that is, bias against "members of an identifiable group distinguished on racial, religious, ethnic, or similar grounds . . . ." ' " (*People v. Bell* (2007) 40 Cal.4th 582, 596, disapproved on another ground in *People v. Sanchez* (2016) 63 Cal.4th 665, 686, fn. 13).  Doing so violates a defendant's federal right to equal protection (*Batson, supra*, 476 U.S. at pp. 88-89) and his or her state right to a trial by a jury drawn from a representative cross-section of the community under article I, section 16 of the California Constitution (*Wheeler, supra*, 22 Cal.3d at pp. 276-277).  As our Supreme Court explained in *Scott,* "The *Batson/Wheeler* framework is designed to enforce the constitutional prohibition on exclusion of persons from jury service on account of their membership in a cognizable group.  It is also designed to otherwise preserve the historical privilege of peremptory challenges free of judicial control, which 'traditionally have been viewed as one means of assuring the selection of a qualified and unbiased jury.' "  (*Scott*, at p. 387.)

A defendant bears the ultimate burden of showing a constitutional violation (*People v. Lenix* (2008) 44 Cal.4th 602, 612-613 (*Lenix*)), but courts employ a three-step, burden-shifting mechanism in assessing whether a *Batson/Wheeler* violation has occurred.  First, the defendant must "make out a prima facie case by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose in the exercise of peremptory

challenges." (*Scott*, *supra*, 61 Cal.4th p. 383.)  Second, if the trial court finds the defendant has established this prima facie case, the prosecutor must then "explain adequately the basis for excusing the juror by offering permissible, nondiscriminatory justifications."  (*Ibid.*)  " 'The justification need not support a challenge for cause, and even a 'trivial' reason, if genuine and neutral will suffice."  [Citation.]  A prospective juror may be excused based upon facial expressions, gestures, hunches, and even for arbitrary or idiosyncratic reasons.' "  (*People v. Winbush* (2017) 2 Cal.5th 402, 434.)  Third, the court must make a " 'sincere and reasoned effort to evaluate the nondiscriminatory justifications' " (*People v. Williams* (2013) 56 Cal.4th 630, 650) and decide whether the prosecutor's proffered reasons are subjectively genuine or instead are a pretext for discrimination.  (See *People v. Gutierrez* (2017) 2 Cal.5th 1150, 1158 (*Gutierrez*); *People v. Duff* (2014) 58 Cal.4th 527, 548.)

### C.  Excusal of Prospective Juror Rogers

Jones argues that the trial court erred in failing to elicit the prosecutor's reasons for striking prospective juror Rogers.  It is undisputed that Jones did not raise a *Batson/Wheeler* motion when the prosecutor exercised a peremptory challenge to excuse Rogers.  We asked the parties to provide supplemental briefing on the effect if, any, of Jones's failure to initially object to this challenge.

Jones argues the fact defense counsel did not tender a *Batson/Wheeler* motion contemporaneously with the prosecutor's strike of Rogers is an insufficient basis to apply the forfeiture doctrine in his case.  He further maintains that in his first *Batson/Wheeler* motion he specifically identified *both* Rogers and Thompson as part of an emerging pattern of discriminatory strikes.

12

The People contend Jones forfeited his *Batson/Wheeler* argument as to prospective juror Rogers by failing to object to the trial court's characterization of his motion, and by failing to request that the prosecutor explain his challenge to Rogers.

At the outset, we conclude the trial court erred to the extent it deemed Jones's *Batson/Wheeler* motion as to prospective juror Rogers was untimely because he failed to object to her excusal. "A *Batson/Wheeler* motion is timely if it is made before jury impanelment is completed, which does not occur ' "until the *alternates* are selected and sworn." ' (*People v. McDermott* (2002) 28 Cal.4th 946, 970.)" (*Scott, supra,* 61 Cal.4th at p. 383.) As our Supreme Court has explained in *McDermott,* "discriminatory motive may become sufficiently apparent to establish a prima facie case only during the selection of alternate jurors, and a motion promptly made before the alternates are sworn, and before any remaining unselected prospective jurors are dismissed, is timely not only as to the prospective jurors challenged during the selection of the alternate jurors but also as to those dismissed during selection of the 12 jurors already sworn." (*McDermott,* at p. 969.) Because Jones objected before the alternate jurors were selected and sworn, his *Batson/Wheeler* motion was timely. We now turn to whether the trial court was required to review the prosecutor's reasons for excusing prospective juror Rogers.

*People v. Avila* (2006) 38 Cal.4th 491 (*Avila*) guides our decision. In that case, our Supreme Court addressed the scope of the trial court's mandatory review on successive *Batson/Wheeler* motions. The defendant objected to the excusal of the first African-American prospective juror, but the trial court found the defendant failed to establish a prima facie case of group bias. (*Avila,* at pp. 541-542.) When the defendant objected to the

13

excusal of a second African-American prospective juror, the trial court found the two excusals constituted a prima facie showing under *Batson*/*Wheeler*, and it elicited the prosecutor's explanation for excusing the second African-American prospective juror, but not the first. (*Avila,* at p. 542.) On appeal, the defendant argued the trial court erred in failing to require the prosecutor to state his reasons for excusing the first African-American prospective juror after it found a prima facie case based on excusal of the second prospective African-American juror. (*Id.* at p. 548.) Our high court rejected this contention, explaining the trial court had "no sua sponte duty to revisit earlier *Batson*/*Wheeler* challenges that it had previously denied," although it had discretion to do so upon request when a subsequent challenge "casts the prosecutor's earlier challenges of the jurors of that same protected class in a new light, such that it gives rise to a prima facie showing of group bias as to those earlier jurors." (*Id.* at p. 552.)

The *Avila* court concluded, "[I]f a *trial court finds a prima facie showing* of group bias at a later point in voir dire, the court need only ask the prosecutor to explain 'each suspect excusal.' [Citation.] Each suspect excusal includes the excusals to which the [moving party] is objecting and which the court has not yet reviewed." (*Avila, supra,* 38 Cal.4th at p. 551, italics added.)

Relying on *Avila*, the court in *Unzueta v. Akopyan* (2019) 42 Cal.App.5th 199 (*Unzueta*), similarly held that once a trial court determines that a prima facie case of discrimination under *Batson*/*Wheeler* has been established by a party's use of peremptory challenges, the trial court must elicit justifications for the suspect excusals. (*Unzueta,* at pp. 216-217.) In *Unzueta*, the trial court, sua sponte, interjected a *Batson*/*Wheeler* motion, after defense counsel exercised peremptory challenges to six Hispanic

14

prospective jurors out of the attorney's seven total challenges. (*Unzueta,* at p. 209.) The trial court found a prima facie showing of racial bias as to *all* six prospective jurors, but denied the *Batson*/*Wheeler* motion without requiring counsel to provide race-neutral justifications for *each* of the challenges. (*Unzueta,* at pp. 209-210.) The *Unzueta* court concluded the trial court erred because "[o]*nce the trial court found a prima facie showing* of group bias, the court was required to elicit from [defense counsel] justifications for each of the six challenges forming the basis for the prima facie showing." (*Id.* at p. 217, italics added.)

Here, unlike in *Avila* and *Jones*, the trial court found there was no prima facie showing of discrimination, and Jones does not contend otherwise. Thus, in the absence of an inference of discriminatory purpose, the trial court was not required to elicit the prosecutor's reasons for excusing prospective juror Rogers. If Jones believed that the prosecutor's reasons for challenging prospective juror Rogers were relevant to establish an inference of discriminatory purpose in excusing prospective juror Thompson, he should have pressed the trial court for a statement of reasons from the prosecutor. His failure to do so forfeited his challenge on appeal. (*People v. Lewis* (2008) 43 Cal.4th 415, 481-482, overruled on another ground in *People v. Black* (2014) 58 Cal.4th 912, 919 [counsel must secure ruling from trial court to pursue claim on appeal].)

In sum, Jones forfeited his claim that the trial court erred in failing to elicit and consider the prosecutor's reasons for excusing prospective juror Rogers.

## D. Excusal of Prospective Jurors Thompson and Winston

### 1. *Standard of Review*

A preliminary question is whether Jones's *Batson/Wheeler* challenge here should be reviewed at the first or third stage. Jones concedes that the trial court found a prima facie case had not been established, but he skips the first-stage inquiry (whether the totality of the relevant facts gives rise to an inference of discriminatory purpose) and instead launches into a third-step analysis (whether the court made a sincere and reasoned effort to evaluate the subjective genuineness of the prosecutor's nondiscriminatory justifications). (*Gutierrez, supra,* 2 Cal.5th at p. 1158.) The People press that we should conduct a first-stage review.[2] Without conceding that Jones established a prima facie case, the People alternately engage in a third-step analysis.

In *Scott*, our Supreme Court acknowledged that the law in distinguishing between a first- and a third-stage review "has not always been entirely consistent." (*Scott, supra,* 61 Cal.4th at p. 386.) In *Scott*, the court "sought to rectify the inconsistency by clarifying that 'where (1) the trial court has determined that no prima facie case of discrimination exists, (2) the trial court allows or invites the prosecutor to state his or her reasons for excusing the juror for the record, (3) the prosecutor provides nondiscriminatory reasons, and (4) the trial court determines that the prosecutor's nondiscriminatory reasons are genuine, an appellate court should begin its analysis of the trial court's denial of the *Batson/Wheeler* motion with a review of the first-stage ruling.'

---

[2] The People argue that Jones's failure to address the trial court's first-stage ruling forfeits his claim on appeal. We do address this claim because, as we explain, Jones's claims fail on the merits whether reviewed at the first or third step.

(*Id.* at p. 391.) Accordingly, if the trial court makes a first-stage ruling before the prosecutor states his or her reasons for excusing the prospective jurors, an appellate court reviews that first-stage ruling. In contrast, when the trial court listens to the prosecutor's reasons *before* purporting to rule on the first stage inquiry, 'we infer an "implied prima facie finding" of discrimination and proceed directly to review of the ultimate question of purposeful discrimination.' (*Id.* at p. 387.)" (*People v. Krebs* (2019) 8 Cal.5th 265, 290, italics added (*Krebs*).)

As to Thompson, the court said it seemed "there was not a prima facie case," but explained that it was "important for the reason for the excusal to be on the record." Then, after hearing those reasons, the court found there were "plausible, non-discriminatory" reasons for excluding Thompson. This is a first-stage ruling. (*Scott, supra,* 61 Cal.4th at p. 391.) Nevertheless, as we explain below, whether this motion is reviewed at the first or third stage, we find the trial court did not err.

As to Winston, the court found he was in a "cognizable class" and asked the prosecutor to "[o]nce again" state his reasoning behind the excusal. If the court's first statement—"I do think . . . Mr. [Winston] is in a cognizable class"—constitutes a ruling that a prima facie case had been established, then we should review that first stage ruling. If on the other hand, the trial court did not make a ruling until after it heard the prosecutor's reason— when it stated "the challenge here is a plausible non-discriminatory challenge"—then we should treat the prima face case as moot and " 'instead skip to *Batson's* third stage.' " (*Krebs, supra,* 8 Cal.5th at p. 290.) The record is susceptible of both readings, but as we discuss, the ambiguity proves immaterial in this case.

17

## 2. *First Stage Analysis*

A prima facie case of racial discrimination in the use of peremptory challenges exists where the totality of the relevant facts gives rise to an inference of discrimination. (*Scott*, *supra*, 61 Cal.4th at p. 384.) The existence of a prima facie case depends on consideration of the entire record of voir dire at the time the motion was made. (*Ibid.*) Relevant evidence may include evidence that a party struck all, most, or a disproportionate number of potential jurors from the identified group, that a party halfheartedly engaged with the jurors during voir dire, or that the defendant was a member of the identified group whereas the victim was a member of the group to which the majority of remaining jurors belonged. (*Ibid.*) "A court may also consider nondiscriminatory reasons for a peremptory challenge that are apparent from and 'clearly established' in the record [citations] and that necessarily dispel any inference of bias." (*Ibid.*) "[W]e independently review the record and determine whether it 'supports an inference that the prosecutor excused a juror on the basis of race.' " (*People v. Edwards* (2013) 57 Cal.4th 658, 698.)

Jones points out that the prosecutor struck three of the five prospective African-American jurors, and that he, Jones, is African-American. Although those facts may be probative on the issue of discriminatory intent (*People v. Bonilla* (2007) 41 Cal.4th 313, 342), the high court has directed us to consider the *totality* of the relevant facts in determining whether an inference of discrimination exists (*Johnson v. California* (2005) 545 U.S. 162, 168). Viewed as a whole, the record reveals nondiscriminatory reasons for excusing Thompson and Winston that dispel any inference of bias.

The prosecutor did not cursorily question Thompson and Winston. The prosecutor asked Thompson about her responses (or lack thereof) in her

questionnaire, and he questioned her about her feelings about the criminal justice system. Thompson repeatedly expressed no opinion. The prosecutor asked Thompson questions about her career, her interaction with people at work, her familiarity with the neighborhood where the crimes occurred, her experience with firearms, her opinion on marijuana use, and more. The prosecutor also questioned Winston about many topics including his jobs in retail, his job-seeking efforts, his college studies, his experience with guns, his ability to stay awake in court, his opinion about marijuana, and his ability to apply the one-witness rule.

Although Jones notes the prosecutor was able to clarify that some of Thompson's answers were the product of her lack of prior jury service, Thompson's apparent lack of opinions suggested she might not be as suited for jury service as other prospective jurors irrespective of race. No inference of purposeful discrimination arose from this strike. (See *People v. Reynoso* (2003) 31 Cal.4th 903, 925-926 (*Reynoso*) [prosecutor's belief that juror "was not sufficiently involved in the jury selection process" was legitimate race-neutral reason; see also *People v. Hensley* (2014) 59 Cal.4th 788, 803 ["Rigid jurors who appear emotionally detached and terse may be divisive during deliberations. They may not perform [as] well as open-minded jurors willing and able to articulate their views and persuade others"]; *United States v. Changco* (9th Cir. 1993) 1 F.3d 837, 840 ["the prosecutor may strike potential jurors for their passivity, inattentiveness or inability to relate to other jurors"].)

The nondiscriminatory reason to excuse Winston was "apparent from and 'clearly established' in the record" (*Scott, supra,* 61 Cal.4th at p. 384)—he fell asleep during voir dire. This is a valid, race- neutral reason to exclude jurors. (See *United States v. Mallett* (8th Cir. 2014) 751 F.3d 907, 915

19

[sleeping juror was a race-neutral justification for a peremptory strike]; *United States v. Maseratti* (5th Cir. 1993) 1 F.3d 330, 335-336 [prosecutor gave a clearly race-neutral reason for striking an African-American juror who " 'appeared to be sleeping during part of the voir dire' "].)

Considering the totality of the circumstances, the record clearly establishes multiple nondiscriminatory reasons for excusing Thompson and Winston.

### 3. *Third Stage Analysis*

Even were we to assume that Jones's challenge has arrived at the third stage, still we would find against him.

At the third stage of the *Batson/Wheeler* inquiry, " 'the issue comes down to whether the trial court finds the prosecutor's race-neutral explanations to be credible.' " (*Lenix, supra,* 44 Cal.4th at p. 613.) "Credibility may be gauged by examining factors including but not limited to ' "the prosecutor's demeanor; by how reasonable, or how improbable, the explanations are; and by whether the proffered rationale has some basis in accepted trial strategy." ' " (*Gutierrez, supra,* 2 Cal.5th at p. 1168.) We thus focus our inquiry " 'on the subjective *genuineness* of the race-neutral reasons given for the peremptory challenge, *not* on the objective *reasonableness* of those reasons.' " (*People v. Chism* (2014) 58 Cal.4th 1266, 1317.) "All that matters is that the prosecutor's reason for exercising the peremptory challenge is sincere and legitimate, legitimate in the sense of being nondiscriminatory. '[A] "legitimate reason" is not a reason that makes sense, but a reason that does not deny equal protection. [Citations.]' [Citation.]" (*Reynoso, supra,* 31 Cal.4th at p. 924.) Review of a trial court's denial of a *Batson/Wheeler* motion "is deferential, examining only whether substantial evidence supports its conclusions. . . . 'So long as the trial court makes a

sincere and reasoned effort to evaluate the nondiscriminatory justifications offered, its conclusions are entitled to deference on appeal.' " (*Lenix,* at pp. 613-614.)

In Jones's view, the trial court did not make a "sincere and reasoned inquiry" to evaluate the prosecutor's reasons. In particular, Jones faults the court for only ruling that the prosecutor's reasons were "plausible, non-discriminatory" reasons without evaluating the "subjective genuineness" of the prosecutor's reasons. We disagree.

As to Thompson, the prosecutor explained that he excused her because she expressed "zero opinions on anything on her questionnaire." The prosecutor said he "did not like the way she was answering the questions." The prosecutor added that "when every single question is answered, 'I don't know,' I don't think that person really gives us anything in the jury pool. I don't think they invest anything in the jury process." The prosecutor noted that he had also removed Mr. A. who had very similar " ' I don't know' " answers. He further explained that the only difference between Mr. A. and Thompson was that Mr. A. was "right out of high school" and had "no life experience." The prosecutor said he thought it was "very problematic" that Thompson had worked in the same job for 26 years, yet "doesn't have any opinions on anything in this case."

In assessing the genuineness of these clearly subjective reasons, the court commented that given Thompson "reviews documents for a living . . . she clearly knows how to read and understand things that are being said to her in documentary form and her questionnaire was noteworthy insofar as very simple, plain questions in the English language were questions as to which an 'I don't know' answer did not make any sense."

The prosecutor's explanations are credible. Nothing " 'disallows reliance on the prospective jurors' body language or manner of answering questions as a basis for rebutting a prima facie case' of exclusion for group bias. [Citation.] . . . 'Nowhere does *Wheeler* or *Batson* say that trivial reasons are invalid. What is required are reasonably specific and neutral explanations that are related to the particular case being tried.' [Citation.]" (*Reynoso, supra*, 31 Cal.4th at p. 917.)

As to Winston, the prosecutor said he excused him because he was "not paying attention at all" and "fell asleep the minute after we stopped questioning him." The trial court made the personal observation that Winston was the only person who nodded off or fell asleep during voir dire. The court further commented that Winston's behavior "signals . . . that maybe even now when he's in the jury box cares not so much about the process here as you would want a juror to care." The court added that Winston's falling asleep was "of some significance" because at 22 years old "he's a very young person and the fact that he is unable to or unwilling to stay awake in a situation where he's been called upon to answer questions and be alert is telling . . . ."

The prosecutor's explanations for excusing Winston clearly are credible. With the burden on the prosecution of proving guilt beyond a reasonable doubt, the concern about jurors being disinterested and not paying attention during trial is obvious. (See *Stubbs v. Gomez* (9th Cir. 1999) 189 F.3d 1099, 1105 [passivity and inattentiveness are " 'valid, race-neutral explanations for excluding jurors' "]; *U.S. v. Power* (9th Cir. 1989) 881 F.2d 733, 740 [demeanor during voir dire that "made the prosecutor believe [juror] would not be an attentive juror" is adequate race-neutral explanation].)

Finally, we note that two African-American jurors sat on the jury. Of

course, the presence of African-American jurors on the jury is "not conclusive" to our inquiry, because the "[e]xclusion of even one prospective juror for reasons impermissible under *Batson* and *Wheeler* constitutes structural error" regardless of how many other venire members were not so erroneously excluded. (*Gutierrez, supra*, 2 Cal.5th at p. 1158.) Nonetheless, a prosecutor's acceptance of a jury with members of a group that the prosecutor allegedly discriminated against "strongly suggests that [bias] was not a motive in his challenge" and, as such, is "an appropriate factor . . . to consider" in the *Batson/Wheeler* analysis. (*Krebs, supra*, 8 Cal.4th at p. 292.) The fact that the prosecution accepted a panel with two African-American jurors on it when it could have excused them is another piece of evidence suggesting that the prosecutor did not harbor group bias against African-Americans.

On balance, after examining the entire record we find the trial court made a sincere and reasoned effort to evaluate the subjective genuineness of the prosecutor's justifications in this matter, and we conclude substantial evidence supports the court's ruling denying defendant's *Batson/Wheeler* motion.

Accordingly, we give its decision the deference to which it is entitled and conclude the trial court did not err in denying Jones's *Batson/Wheeler* motions. (*Lenix, supra*, 44 Cal.4th at pp. 613-614.)

## II.

### *Right to Confrontation and Presentation of Defense Evidence*

Jones contends the trial court violated his Sixth Amendment right to confrontation and his due process right to present a defense when it precluded him from cross-examining Williams about prior false statements she had made in the course of an unrelated criminal case in 2003.

23

### A. Background

Prior to trial, the prosecution moved to exclude evidence of an unrelated case from 2003 involving Benitez and then 16-year-old Williams on Evidence Code section 352 grounds. In that case, Benitez had been charged with possession after a search of the home he shared with Williams revealed methamphetamine. During the search, Williams said she had additional drugs in her pocket and claimed they were hers. At the subsequent grand jury proceedings, Williams admitted to lying about owning the drugs in order to shield Benitez from criminal liability.

At an in limine hearing, defense counsel argued that the evidence was relevant character evidence to show the lengths to which Williams would go to protect Benitez and further his interests. Defense counsel posited Williams had been attacked by someone other than Jones and that Williams fabricated the charges against Jones at Benitez's behest. The prosecutor countered Williams had led a crime-free life for 13 years since 2003 and that the challenged evidence was cumulative since defense counsel would have "plenty of ammunition to get back to [Williams] for . . . moral turpitude" by Williams admitting her close and long-term relationship with someone in the illegal drug business. The prosecutor also challenged Jones's third-party culpability defense, stating it was not supported by the evidence.

The trial court thoroughly reviewed the challenged evidence and excluded it under Evidence Code section 352, finding that the evidence would necessitate an undue consumption of time and the "distinct possibility" of confusing the issues. The court also found there was no evidence to support Jones's "wildly irrational" position that Williams had fabricated the charges against Jones and that any connection between the 2003 case and the instant case was too tenuous.

**B. Analysis**

Preliminarily, the People claim that Jones failed to preserve his federal constitutional claims by objecting only on Evidence Code section 352 grounds. We need not reach this issue because, as we explain, Jones's claims fail on the merits.

Under both the California and federal constitutions, a defendant's right to confront the witnesses against him encompasses a right to impeach those witnesses. (U.S. Const., 6th & 14th Amends.; Cal. Const., art. I, § 15; *Delaware v. Van Arsdall* (1986) 475 U.S. 673, 684 (*Van Arsdall*); *Davis v. Alaska* (1974) 415 U.S. 308, 316; *People v. Quartermain* (1997) 16 Cal.4th 600, 624.) But not every restriction on a defendant's desired method of cross-examination is a constitutional violation. (*People v. Chatman* (2006) 38 Cal.4th 344, 372.) The trial court "retains wide latitude in restricting cross-examination that is repetitive, prejudicial, confusing of the issues, or of marginal relevance. [Citations.]" (*People v. Frye* (1998) 18 Cal.4th 894, 946 (*Frye*), disapproved on other grounds by *People v. Doolin* (2009) 45 Cal.4th 390.) And, absent a showing by defendant that the prohibited cross-examination would have produced "a significantly different impression of [the witness's] credibility" (*Van Arsdall,* at p. 680), there is no confrontation clause violation (*Frye,* at p. 946). Thus, "the exclusion of impeachment evidence on collateral matters, which have only a slight probative value on a witness's veracity, does not infringe on the right to confrontation." (*People v. Ghebretensae* (2013) 222 Cal.App.4th 741, 751, overruled in part on other grounds in *People v. Bryant* (2021) 11 Cal.5th 976.)

According to Jones, Williams's testimony was the "sole incriminating evidence" against him and the excluded evidence was crucial to show the likelihood that she falsely identified him at the behest of Benitez. Jones

25

speculates that Benitez "may well have viewed [Jones] as a competitor in the local drug trade," and he used Williams to do his bidding by falsely identifying Jones as the perpetrator.

The fact that Williams had lied in a prior criminal investigation was probative of her credibility in general. The defense, however, was able to challenge Williams's credibility on cross-examination without getting into the 2003 incident. On cross-examination, Williams acknowledged that Benitez supported the family and that he did "pretty well with his marijuana business." She further admitted that Benitez grew and packaged marijuana at their home. The defense also presented testimony from Williams's son that contradicted her version of the events. Finding the questioning about Williams's involvement in an unrelated criminal case from 13 years ago would likely involve a considerable amount of time and confuse the jury by getting into collateral matters, the trial court precluded this line of questioning.

We find no error. The proffered line of cross-examination was not relevant to any disputed fact or consequence regarding Jones's guilt with respect to the charged crimes. (Evid. Code, § 210.) That Williams had once lied in an unrelated case to protect her boyfriend added little to discredit her eyewitness account that Jones was the man who had attacked her.

Because Jones cannot show that the introduction of the excluded line of cross-examination would have produced a significantly different impression of Williams's credibility (*Van Arsdall, supra,* 475 U.S. at p. 680), we conclude the trial court's ruling did not violate Jones's rights under the Sixth Amendment.

Moreover, the ordinary rules of evidence, including the application of Evidence Code section 352, do not infringe on the accused's due process right

26

to present a defense.  (*Frye, supra,* 18 Cal.4th at p. 948.)  We will not disturb a trial court's exercise of discretion under Evidence Code section 352 unless it is shown the trial court exercised its discretion " 'in an arbitrary, capricious or patently absurd manner.' "  (*People v. Sanders* (1995) 11 Cal.4th 475, 512.)

Here, the trial court could reasonably find the defense's attempt at discrediting Williams was highly attenuated and posed a risk of diverting the jury's attention to extraneous matters.  (Evid. Code, § 352.)  Any suggestion that Williams and her boyfriend colluded to frame Jones is purely speculative and unsupported by the evidence.  As the trial court noted, the defense theory that Williams lied in order to remove Jones as a competitor in the local marijuana scene was "wildly irrational."

We conclude the trial court acted within its discretion in prohibiting defense counsel from delving into unrelated criminal proceedings that occurred in 2003.

## DISPOSITION

The judgment is affirmed.

                                              _____

                                              STEWART, J.

We concur.

_____

KLINE, P.J.

_____

RICHMAN, J.

*People v. Jones* (A152863)